David LAIME and Jeanna Dodd *v.*
STATE of Arkansas

CR 01-559 60 S.W.3d 464

Supreme Court of Arkansas
Opinion delivered December 6, 2001

144

*Wilson & Associates, P.L.L.C.*, by: *Patrick J. Benca*, for appellant David Laime.

*Jeff Rosenzweig*, for appellant Jeanna Dodd.

*Mark Pryor*, Att'y Gen., by: *Misty Wilson Borkowski*, Ass't Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. The appellants in this case, David Laime and Jeanna Dodd, appeal from an order denying their motion to suppress drug evidence and statements. They raise seven points on appeal: (1) the state trooper lacked probable cause to make the initial stop of their vehicle; (2) the state trooper had no reasonable suspicion to detain them after proof of the vehicle's registration was provided; (3) invocation of one's constitutional rights cannot be grounds for probable cause; (4) the affidavit for search warrant omitted facts regarding the drug dog's reliability which caused a *Franks v. Delaware* violation; (5) the drug dog's "alert" on the vehicle did not constitute probable cause to search; (6) the search warrant was objectively unreasonable in stating that an invocation of constitutional rights provided probable cause; and (7) there was no proper basis for a nighttime search. We affirm the circuit judge's order denying the motion to suppress and reverse the decision by our court of appeals. *See Laime v. State*, 73 Ark. App. 377, 43 S.W.3d 216 (2001).

The facts given in this case are taken from Arkansas State Trooper David Ramsey's affidavit supporting the search warrant and probable cause for arrest as well as his testimony at the suppression hearing. We note initially that the affidavit and the testimony vary in certain important respects, which we will note in this opinion. At approximately 5:45 p.m. on July 28, 1998, Trooper Ramsey was patrolling Interstate 30 between Benton and Little Rock in a marked patrol unit. He observed a green 1986 Dodge van in the left-hand lane. The van was in the process of slowly passing two tractor-trailer trucks. Although the van was driving in the left lane of a double-lane stretch of I-30 with a 70 mile-per-hour speed limit, it was traveling at a speed of approximately 60 miles per hour. Two cars separated the trooper's patrol car from the van.

Trooper Ramsey believed that the van was hindering traffic and that the driver of the van was driving in violation of Arkansas's

left-lane law. *See* Ark. Code Ann. § 27-51-301(b) (Supp. 2001). When the van cleared the trucks, it pulled into the right-hand lane. According to the trooper's testimony, although the van was no longer in violation of any traffic law, he decided to pursue the left-lane violation. He pulled his patrol car behind the van and noted its Texas license plate number. He called the license plate number in to a state police operator to determine the validity of its registration, and the result of the call was that the van was not registered in Texas.

At this point, Trooper Ramsey pulled the van over to the side of the interstate to investigate its lack of registration. The trooper approached the driver of the van, David Laime, and requested to see his driver's license. Laime produced a Virginia identification card in his name. Trooper Ramsey asked Laime if he had a driver's license; he also asked whether the van belonged to Laime in light of the fact that its plates were from Texas and Laime's identification was from Virginia. Laime replied that the van did not belong to him but belonged to a friend and that he was driving to Little Rock to meet several people who were giving him a ride to Washington, D.C. Laime then referred to his passenger, who was later identified as Jeanna Dodd, and told the trooper that his passenger was planning to drive the van back to Texas after she dropped Laime off in Little Rock. Laime also told the trooper that he and Dodd were planning to meet some friends at a Little Rock restaurant for dinner at 6:00 p.m., and that it was these people who were then going to take him to Washington, D.C. At some point during this interchange, Laime produced a Virginia driver's license.

Trooper Ramsey next asked about the van's registration and insurance. Laime offered the trooper proof of insurance, but the proof showed that the vehicle insured was a Subaru, not a Dodge van. After receiving this information, Trooper Ramsey returned to his patrol car and ran the Texas license plate number through the law enforcement database a second time. Again, he received information that the van was not registered in Texas. According to his affidavit for probable cause, at this time he requested a criminal history search on Laime. According to his affidavit for a search warrant and subsequent testimony, the request occurred later. The trooper returned to the van and asked Laime to accompany him to his patrol car to answer some questions. Laime agreed. Laime then offered Trooper Ramsey the registration documents for the van. These documents showed that the van was registered to Jeanna Dodd in Houston, Texas. At that point, Trooper Ramsey still did not know that Jeanna Dodd was the name of Laime's passenger.

The registration had been issued that very day at approximately 12:30 p.m., in Houston, Texas. Trooper Ramsey testified at the suppression hearing that because of this information, his suspicions about the van's registration were dispelled. He wrote Laime a warning ticket for "license not on file." After the warning ticket, he ran the criminal history check on Laime, according to his affidavit for a search warrant. Hours later, back at the Bryant police station, he added an additional warning on the ticket for "impeding the flow of traffic."

During the interchange in the patrol car after Laime had submitted the van's valid registration, Laime asked several times why he was being stopped and detained. Trooper Ramsey testified at the suppression hearing that he tried to answer Laime's questions, but that "before I could get a chance to answer it he'd done fired up about four more." Laime told the trooper that he needed to get to Little Rock as soon as possible because his friends would not wait for him to arrive. He added that if he did not meet the friends for dinner, they would leave him and he would miss his ride to Washington, D.C. Trooper Ramsey asked Laime the names of his friends and at which restaurant he was meeting the friends. Laime responded that he could not remember either, but that his passenger knew. Laime then told Trooper Ramsey that his passenger was his sister. According to Trooper Ramsey's testimony on cross-examination at the suppression hearing, his suspicions were aroused solely on the basis of the above-stated facts, and he had at this point made up his mind to search the van. The trooper made no comparable statement in his affidavits or on direct examination.

Trooper Ramsey next testified at the suppression hearing that he asked Laime to remain in the patrol car while he checked with his passenger in the van about the dinner arrangements. Whether this conversation ever took place is a matter of factual dispute in this case. In reviewing Trooper Ramsey's two affidavits (one for the search warrant and the second for probable cause to arrest), no mention is made of this conversation. At that time, Dodd told the trooper that she and Laime were driving up from Texas to meet some friends, and that these friends were going to give him a ride to Washington, D.C. She told Ramsey that she and Laime were planning on meeting the friends for dinner and then she was taking the van back to Texas. She confirmed Laime's statement that she was his sister. However, she could not remember the name of the restaurant where they were to meet their friends or the names of the friends, but she said that Laime knew. According to Trooper

Ramsey's testimony at the suppression hearing, he did not yet know Dodd's name even after this exchange.

Trooper Ramsey testified that now he was suspicious of Laime and Dodd because their stories were vague and were "kind of falling apart." He added that he was concerned because neither of the subjects could remember the name of the restaurant at which they were planning to meet the friends or the friends' names, but each said the other knew those names. The trooper said he was also concerned because they were driving a van that belonged to a friend.

The trooper returned to his patrol car, where Laime was still seated. It was then that he ran a criminal history check on Laime, according to his testimony at the suppression hearing. The results showed that Laime had a drug arrest in Florida and a drug charge in Virginia.[1] The trooper next asked Laime if he had "ever been arrested before." Laime replied that he had had a speeding ticket or some kind of traffic offense several years ago but that he could not remember what it was for. Trooper Ramsey next asked Laime: "You're not one of them guys . . . carrying dope down the highway or anything . . . ?" The trooper also asked Laime if he had any "guns or dead bodies or stuff" in the van. Laime grew increasingly irritated during this exchange and repeatedly asserted that he needed to get back on the road to meet his friends. Trooper Ramsey described Laime's behavior as irate, "bad combative," and hostile, and noted that he was gesturing wildly and that his body language suggested that he was angry.

Because of this, the trooper called for backup. After this call, Trooper Ramsey asked Laime if he could search the vehicle.[2] Laime

---

[1] As to when Trooper Ramsey got Laime's criminal history, the record is unclear. His affidavit for probable cause says the radio operator called back after the trooper asked Laime about his arrest record. The affidavit for search warrant does not state whether Trooper Ramsey had the criminal history before or after he questioned Laime about his record.

[2] The precise chronology of events is a matter of factual dispute in this case. According to his testimony on direct examination at the suppression hearing, it was at this point that Trooper Ramsey decided to search the van — *after* he had spoken with Dodd. However, in the affidavit that Trooper Ramsey wrote for the search warrant, the affidavit for probable cause, and his cross-examination, he makes no mention of Dodd in connection with his decision to search. Trooper Ramsey testified at the hearing that his memory was better at the times that he wrote the two affidavits than it was at the suppression hearing. On cross-examination, he admitted that he decided to search the van much earlier, before he ever spoke to Dodd.

vigorously objected to this. The trooper described what happened next at the suppression hearing:

> He starts in that I was beginning to violate his constitutional rights. That he's a law student and he knows right from wrong and that I was detaining him from getting to Little Rock by 6:00. By now I had the consent to search form out and I asked him did he know what this was. He said, "You're not going to look." I said, "Well, just let me explain this thing a minute." I started filling out the top part and he said, "You're not going to look." I tried to read the top part up there and fill in the dates and times and things like that on there. He's just telling me I'm not going to look.

After this exchange, Laime's demeanor deteriorated further, according to the trooper. He repeated: "You're violating my constitutional rights and I demand you let me go." Laime repeated that he was a law student and threatened civil litigation.

Trooper Ramsey went back to the van to talk to Dodd about getting her consent to search the van. He asked Dodd for identification. At this point, according to his testimony, he learned her name for the first time. He asked her why she had stated that the van belonged to a friend when it was registered in her name. He also asked her if she would consent to a search of the van, to which she replied that she did not have time for a search because of the dinner engagement. She denied having any contraband in the van. Trooper Ramsey further noted at the suppression hearing that Dodd was eating potato chips during this conversation, which he believed was inconsistent with her contention that she was on her way to a Little Rock restaurant for dinner.

Trooper Ramsey returned to the patrol car, where Laime was still sitting, and told Laime that he wanted to run his drug dog, Moose, around the van.[3] At this point, Laime "went ballistic," according to Trooper Ramsey. He insisted that he either be arrested or be released, and the trooper responded that Laime was not under arrest and was free to go. Laime immediately got out of the patrol car and hurriedly walked toward the van. Before Laime could reach the van, Trooper Ramsey stopped him and informed him that while he was free to go, he could not take the van with him because he planned on running the drug dog around it. Trooper Ramsey recalled his specific words: "Y'all are free to leave. You can go. You

---

[3] The drug dog apparently had been in the patrol car the entire time.

can walk. You can run. You can crawl, just get out of here." However, the trooper would not let them within 20 feet of the van for fear that the drug dog would bite them. This entire time, according to the trooper, Laime was repeatedly and boisterously asserting his constitutional rights, telling the trooper that he had no right to detain them, and that "this is America."

Three troopers then arrived as backup. At that time, Trooper Ramsey began running the drug dog, Moose, around the van. He testified at the suppression hearing that Moose was trained to respond to marijuana, cocaine, heroin, and methamphetamine. Moose "alerted" on the van four times, indicating the presence of illegal drugs. Trooper Ramsey informed Laime that Moose's behavior showed there were illegal drugs in the van, and that the troopers were going to search the van. One of the newly-arrived troopers escorted Laime to a patrol car and held him there while the other troopers searched the contents of the van.

During this search, the troopers found a small loose amount of brownish-green vegetable matter that they suspected was marijuana in the bottom of a pouch on the back of the driver's seat. The state crime laboratory later weighed the amount as .1 gram. They also found a marijuana seed in the pocket of the driver's side door. At this point, the troopers arrested Dodd and Laime for possession of a controlled substance.

The search of the van continued, and the troopers found a shotgun case containing about twenty blown glass pipes or bongs. Trooper Ramsey noted that they were new and still had price tags on them. The bongs did not appear to have been used to smoke marijuana. The troopers also found two locked safes, a large one and a small one. They pulled these safes out of the van and onto the side of the road. After Dodd refused to open the safes, Trooper Ramsey had the drug dog react to the safes. Moose alerted on both safes.

The troopers decided to place the safes back in the van and obtain a search warrant for them. During the course of placing the smaller safe into the van, the safe slipped accidentally and broke open on the road. Despite the drug dog's previous alert on the broken safe, there was nothing in the safe.

The troopers took Dodd and Laime to the Bryant police station and had the van towed there. Trooper Ramsey swore out an affidavit for a search warrant for the second safe in the van and took

it to the Bryant municipal judge's home. The judge signed the search warrant, and it was executed shortly before midnight that night on the safe in the van at the Bryant police station.

When the troopers searched the safe, they found several sheets of paper which were perforated. The sheets of paper contained a large number of doses of LSD, as indicated by a field chemical test the troopers performed on the paper. The troopers also found a film canister which contained what they believed to be cocaine residue and a leather pouch which contained a few marijuana seeds. The troopers further found some glass pipes containing marijuana residue.

On August 6, 1998, Laime and Dodd were charged by criminal information with the offenses of possession of LSD with intent to deliver, possession of drug paraphernalia, possession of cocaine, and possession of marijuana. They subsequently moved to suppress the physical evidence seized during the roadside search and the search of the safe which occurred at the Bryant police station. The motion also included a request for suppression of any statements made by them during the course of their contact with the state troopers. An amended criminal information eliminated the cocaine charge but added that Laime had a prior criminal conviction for illegal drug possession and was subject to enhanced sentencing under Ark. Code Ann. § 5-64-408 (Repl. 1997).

On May 5, 1999, the circuit judge held a hearing on the motion to suppress. The judge heard testimony from Trooper Ramsey and Trooper James Kelloms. On February 2, 2000, the circuit judge entered an order denying the motion to suppress. Laime and Dodd then entered conditional pleas of guilty, reserving their right to appeal the non-suppression order under Ark. R. Crim. P. 24.3(b). Laime was sentenced to ten years in prison. Dodd was sentenced to four months in prison and eight years probation.

### I. Standard of Review

Laime and Dodd argue multiple grounds for reversal, as previously set out in this opinion. In most respects, their points for reversal overlap. We begin by noting the standard of review, which is critical to this case. In reviewing a ruling denying a defendant's motion to suppress, we make an independent determination based on the totality of the circumstances and view the evidence in the light most favorable to the State. We reverse only if the trial court's

ruling is clearly against the preponderance of the evidence. *Burris v. State,* 330 Ark. 66, 954 S.W.2d 209 (1997); *Wofford v. State,* 330 Ark. 8, 952 S.W.2d 646 (1997). When we grant a petition to review a decision of the court of appeals, we treat the matter as if the appeal had been originally filed in this court. *Thompson v. State,* 333 Ark. 92, 966 S.W.2d 901 (1998); *Frette v. City of Springdale,* 331 Ark. 103, 959 S.W.2d 734 (1998). This court defers to the trial court in assessing witness credibility. *E.g., Rankin v. State,* 338 Ark. 723, 1 S.W.3d 14 (1999); *Wright v. State,* 335 Ark. 395, 983 S.W.2d 397 (1998); *Tabor v. State,* 333 Ark. 429, 971 S.W.2d 227 (1998).

## II. Traffic Stop

For their first point, Laime and Dodd contend that Trooper Ramsey did not have probable cause to make the initial stop of the van. They assert that the left-lane law, Ark. Code. Ann. § 27-51-301(b) (Supp. 2001), which they were allegedly violating, is unconstitutionally vague and that Trooper Ramsey only stopped their van as a pretext to search it. The State counters that under the standard established by this court in *Travis v. State,* 331 Ark. 7, 959 S.W.2d 32 (1998), Trooper Ramsey had more than sufficient probable cause to make the traffic stop.

We need not reach Laime's and Dodd's pretextual argument or their vagueness argument regarding § 27-51-301(b), because we conclude that the trooper's information about lack of a valid Texas registration for the van gave him probable cause to make a valid stop. It is true that in order for a police officer to make a traffic stop, he must have probable cause to believe that the vehicle has violated a traffic law. *Travis v. State, supra.* Probable cause is defined as facts or circumstances within a police officer's knowledge that are sufficient to permit a person of reasonable caution to believe that an offense has been committed by the person suspected. *Burris v. State, supra; Hudson v. State,* 316 Ark. 360, 872 S.W.2d 68 (1994). In assessing the existence of probable cause, our review is liberal rather than strict. *Brunson v. State,* 327 Ark. 567, 940 S.W.2d 440 (1997). Whether a police officer has probable cause to make a traffic stop does not depend on whether the driver was actually guilty of the violation which the officer believed to have occurred. *Travis v. State, supra. See also Barrientos v. State,* 72 Ark. App. 376, 39 S.W.3d 17 (2001).

In *Travis v. State, supra,* we held that what appeared to be illegality regarding a license plate without expiration tags gave a

police officer probable cause to stop that vehicle and investigate the circumstances. This was so even though a Texas license plate was involved, and Texas had no requirement that expiration tags be on the license plate. Our holding in *Travis* comports with our other cases involving license plates and probable cause to stop. *See, e.g., Burris v. State, supra* (holding that probable cause to stop existed when trailer's license plate was illegally fastened and was flapping in the wind and taillight cover was broken); *Wilburn v. State,* 317 Ark. 73, 876 S.W.2d 555 (1994) (holding that a police officer had probable cause to stop a motorist when he discovered that the vehicle bore a license plate which was issued to a different car in violation of state law). *See also Wimbley v. State,* 68 Ark. App. 56, 3 S.W.3d 709 (1999) (holding that a police officer had probable cause to stop a truck which had no license plate in violation of state law).

■ We hold that the circuit judge did not err in finding that the traffic stop was valid.

### III. Reasonable Suspicion

We turn next to Laime's and Dodd's claim that Trooper Ramsey lacked grounds to detain them after they presented proof that the van was validly registered in Texas.

■ Our rule which provides when a detention without an arrest may transpire reads as follows:

> A law enforcement officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit (1) a felony, or (2) a misdemeanor involving danger of forcible injury to persons or of appropriation of or damage to property, if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct. An officer acting under this rule may require the person to remain in or near such place in the officer's presence for a period of not more than fifteen (15) minutes or for such time as is reasonable under the circumstances. At the end of such period

the person detained shall be released without further restraint, or arrested and charged with an offense.

Ark. R. Crim. P. 3.1.[4] The rule is precise in stating that the reasonable suspicion must be tied to commission of a felony or a misdemeanor involving forcible injury to persons or property.

■ Our criminal rules also define "reasonable suspicion" as "a suspicion based on facts or circumstances which of themselves do not give rise to the probable cause requisite to justify a lawful arrest, but which give rise to more than a bare suspicion; that is, a suspicion that is reasonable as opposed to an imaginary or purely conjectural suspicion." Ark. R. Crim. P. 2.1. This court has further said that "[w]hether there is reasonable suspicion depends on whether, under the totality of the circumstances, the police have specific, particularized, and articulable reasons indicating that the person may be involved in criminal activity." Smith v. State, 343 Ark. 552, 570, 39 S.W.3d 739, 750 (2001) (citing Hill v. State, 275 Ark. 71, 628 S.W.2d 284 (1982)). See also Ark. Code Ann. § 16-81-202 (1987).

■ In this same vein, the General Assembly has passed legislation listing the factors to be considered in determining if a police officer has grounds to reasonably suspect:

(1) The demeanor of the suspect;

(2) The gait and manner of the suspect;

(3) Any knowledge the officer may have of the suspect's background or character;

(4) Whether the suspect is carrying anything, and what he is carrying;

(5) The manner in which the suspect is dressed, including bulges in clothing, when considered in light of all of the other factors;

(6) The time of the day or night the suspect is observed;

---

[4] The length of time of the detention is not raised as an issue in this appeal. Rather, the issue raised is whether Trooper Ramsey had grounds to detain Laime and Dodd at all.

(7) Any overheard conversation of the suspect;

(8) The particular streets and areas involved;

(9) Any information received from third persons, whether they are known or unknown;

(10) Whether the suspect is consorting with others whose conduct is "reasonably suspect";

(11) The suspect's proximity to known criminal conduct;

(12) Incidence of crime in the immediate neighborhood;

(13) The suspect's apparent effort to conceal an article;

(14) Apparent effort of the suspect to avoid identification or confrontation by the police.

Ark. Code Ann. § 16-81-203 (1987). This court has stated that § 16-81-203 is merely illustrative, and not exhaustive, of the types of factors that may be considered in forming reasonable suspicion. *See Potter v. State*, 342 Ark. 621, 30 S.W.3d 701 (2000); *Muhammad v. State*, 337 Ark. 291, 988 S.W.2d 17 (1999). As is the case with Rule 3.1, the reasonable suspicion under state statutes must be coupled to the fact that the suspect is involved in some felonious activity. *See* Ark. Code Ann. § 16-81-204 (1987). Specifically, § 16-81-204(a) refers to a reasonable suspicion that the person "is committing, has committed, or is about to commit a felony."

The genesis for both the criminal rule and state statute is *Terry v. Ohio*, 392 U.S. 1 (1968). In *Terry*, the United States Supreme Court held that a police officer could detain a person without violating the Fourth Amendment if that officer had a reasonable suspicion that "criminal activity may be afoot." *Terry*, 392 U.S. at 30. Both Ark. R. Crim. P. 3.1 and § 16-81-204 are more specific in stating that the detention must be associated with suspected felonious activity or, in the case of Rule 3.1, either a felony or a misdemeanor involving forcible injury.

In the case at hand, the State sets forth five factors which, it asserts, gave Trooper Ramsey reasonable suspicion that criminal activity was underway or imminent:

(1) Laime's irritated, hostile, demanding, and combative demeanor, which includes his refusal to consent to a search and his invocation of his constitutional rights;

(2) The fact that both Laime and Dodd told Ramsey they were meeting people in Little Rock for dinner, but neither of them was able to name the restaurant or their dinner companions;

(3) Laime's assertion that the van was borrowed from a friend, but the van had actually been registered to Dodd earlier that day;

(4) The fact that Ramsey asked Laime if he had ever been arrested, and although Laime disclosed only a traffic violation, he had been previously arrested on drug charges;

(5) Dodd's consumption of potato chips, which was inconsistent with her assertion that she and Laime were on their way to Little Rock to eat dinner.

We begin by noting that the focal point for our analysis must be the time when Trooper Ramsey decided that the registration of the van was valid because at that point the reason for the stop had vanished. This court has held with respect to the issue of whether probable cause to arrest exists that (1) after-acquired knowledge is irrelevant to the probable cause analysis, and (2) only what the police officer knew at the time of arrest enters the analysis. *Friend v. State*, 315 Ark. 143, 865 S.W.2d 275 (1993) (citing *Beck v. Ohio*, 379 U.S. 89 (1964); *Roderick v. State*, 288 Ark. 360, 705 S.W.2d 433 (1986)). The same principle holds true with respect to a decision on whether to detain under Rule 3.1.

At the same time, this court recognizes that as part of a valid traffic stop, a police officer may detain a traffic offender while he completes certain routine tasks. This detention is, of course, unrelated to a Rule 3.1 detention. The Eighth Circuit Court of Appeals has discussed the detention associated with a valid traffic stop succinctly:

[H]aving made a valid traffic stop, the police officer may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning. *See United States v. Carrazco*, 91 F.3d 65, 66

(8th Cir. 1996). During this process, the officer may ask the motorist routine questions such as his destination, the purpose of the trip, or whether the officer may search the vehicle, and he may act on whatever information is volunteered.

*United States v. $404,905.00 In U.S. Currency*, 182 F.3d 643, 647 (8th Cir. 1999). Routine questioning and the criminal history check appear to be precisely what Trooper Ramsey engaged in as part of a valid traffic stop.

Under these circumstances, we consider a criminal background check to have been not only routine but prudent. The van initially appeared to be unregistered; the trooper was given papers on a Subaru, not a Dodge van; the trooper was told that the van was owned by a friend and not by the driver or passenger; and Laime first gave the trooper a Virginia I.D. card and not a driver's license. Most importantly, according to one affidavit, the background check was set in motion *before* the question about the van's registration was resolved.

▆ We conclude that under the totality-of-the-circumstances standard and viewing the evidence in the light most favorable to the State, as we are required to do, reasonable suspicion of criminal activity was legitimately entertained by Trooper Ramsey. The background check first revealed a drug conviction which Laime lied about. The trooper's suspicions were magnified by the couple's ignorance of their destination and the names of their friends as well as Laime's ever-increasing agitation. All of this led to the canine sniff and the positive alert to drugs by the drug dog. We hold that the Fourth Amendment protection afforded Laime and Dodd was not violated in this case, and we affirm the circuit judge on this point.

▆ In holding as we do, we emphasize that Laime's invocation of his Fourth Amendment rights cannot be the sole basis for probable cause to search. *See Florida v. Bostick*, 501 U.S. 429 (1991) (a suspect's assertion of his constitutional rights cannot be the sole basis for probable cause to search); *Doyle v. Ohio*, 426 U.S. 610 (1976) (post-*Miranda* warnings silence cannot be used to impeach a defendant's credibility); *United States v. Hyppolite*, 65 F.3d 1151 (8th Cir. 1995) (refusal to consent to search cannot be sole basis for probable cause to search apartment). That principle is fundamental, and our jurisprudence is clear. The legitimate assertion of one's constitutional rights is not a weapon to be used against a criminal suspect.

■ Nor can mere nervousness, standing alone, constitute reasonable suspicion of criminal activity and grounds for detention. We agree with the Eighth Circuit Court of Appeals in this regard. *See United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998). As was stated by the *Beck* court, initial signs of nervousness are commonplace when one is confronted by a law enforcement officer. *Id.* Nevertheless, Laime's conduct is distinguishable. It went from inquisitiveness to anger to combativeness when Trooper Ramsey began to delve into his criminal record and suggested a search of the van. The fact that criminal history and an angry response were involved distinguishes this case from the *Beck* facts. *See United States v. Lebrun*, 261 F.3d 731 (8th Cir. 2001).

■ As a final point, we discount the eating of snack food as a bonafide factor for reasonable suspicion.

## IV. Drug Dog Search

Dodd briefly argues as one of her points that a dog sniff, standing alone, cannot constitute probable cause to search. Laime and Dodd argue much more extensively that Trooper Ramsey's affidavit supporting the search warrant was inadequate under *Franks v. Delaware*, 438 U.S. 154 (1978). They base their *Franks* argument on the trooper's failure to state in the affidavit that the drug dog, Moose, had already falsely alerted on one safe. They also assert that Trooper Ramsey knew that Moose had been inaccurate at least ten times and possibly as many as fifty times but did not mention this fact in the affidavit.

According to the Eighth Circuit Court of Appeals, a dog sniff that results in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs within the item, if the dog is reliable. *United States v. Sundby*, 186 F.3d 873 (8th Cir. 1999); *United States v. Bloomfield*, 40 F.3d 910 (8th Cir. 1994). *See also Newton v. State*, 73 Ark. App. 285, 43 S.W.3d 170 (2001). In *Sundby*, the Eighth Circuit stated:

A dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance if the dog is reliable. To establish the dog's reliability, the affidavit need only state the dog has been trained and certified to detect drugs. An affidavit need not give a detailed account of the dog's track record or education.

*Sundby*, 186 F.3d at 876 (cases omitted). This court has never been confronted with the issue of whether a dog sniff, standing alone, provides probable cause to search.

We need not reach that issue in the instant case because the dog sniff was bolstered by other facts in the trooper's affidavit. Particularly, the search warrant and affidavit referred to Laime's criminal history, his failure to honestly disclose his drug arrest and charge, his refusal to reveal details about the van's ownership, his combative demeanor, and the marijuana and drug paraphernalia that the trooper found before the warrant was obtained.

We turn then to the allegation that Trooper Ramsey committed a *Franks* violation in this case. The *Franks* decision stands for the proposition that if a defendant shows by a preponderance of the evidence that (1) the affiant for a search warrant made a false statement knowingly and intelligently, or with reckless disregard of the truth, and (2) with the affidavit's false material set aside, the affidavit's remaining content is insufficient to establish probable cause, the search warrant should be invalidated. *State v. Rufus*, 338 Ark. 305, 993 S.W.2d 490 (1999) (citing *Pyle v. State*, 314 Ark. 165, 862 S.W.2d 823 (1993)). Matters omitted must be material circumstances which contradict or dispel the incriminating factors in the affidavit and which render what is in the affidavit effectively false because of their nondisclosure. *Biggers v. State*, 317 Ark. 414, 878 S.W.2d 717 (1994) (citing *Pyle, supra*).

We need not address this point because we conclude that upon finding marijuana and drug paraphernalia in the van following the drug dog's positive alert, the troopers had reasonable cause to believe that the van contained other things subject to seizure. Under our criminal rule and case law, a search of the van could commence under these facts without a search warrant. *See* Ark. R. Crim. P. 14.1; *Bohanan v. State*, 324 Ark. 158, 919 S.W.2d 198 (1996). As a result, any asserted defect in the affidavit for a search warrant is of no moment as a warrantless search could have been performed.

We affirm on this point.

### V. Nighttime Search

Arkansas Rule of Criminal Procedure 13.2(c) authorizes a nighttime search under the following circumstances:

Except as hereafter provided, the search warrant shall provide that it be executed between the hours of six a.m. and eight p.m., and within a reasonable time, not to exceed sixty (60) days. Upon a finding by the issuing judicial officer of reasonable cause to believe that:

> (i) the place to be searched is difficult of speedy access; or

> (ii) the objects to be seized are in danger of imminent removal; or

> (iii) the warrant can only be safely or successfully executed at nighttime or under circumstances the occurrence of which is difficult to predict with accuracy;

the issuing judicial officer may, by appropriate provision in the warrant, authorize its execution at any time, day or night, and within a reasonable time not to exceed sixty (60) days from the date of issuance.

Ark. R. Crim. P. 13.2(c). *See Fouse v. State*, 337 Ark. 13, 989 S.W.2d 146 (1999).

 We give the appellants' arguments under this point little credence. The search of the safe took place at the Bryant police station. The policy considerations that led to the adoption of Rule 13.2(c) and nighttime searches of dwellings simply do not pertain to a search of a van at a police station. We affirm on this point as well.

Affirmed.

CORBIN and HANNAH, JJ., dissent.

THORNTON, J., dissents. I dissent on the basis of the analysis provided in the Arkansas Court of Appeals' decision of *Laime v. State*, 73 Ark. App. 377, 43 S.W.3d 216 (2001).

JIM HANNAH, Justice, dissenting. I am concerned about the erosion of every citizen's right against unlawful search and seizure under both the Arkansas and the United States Constitutions. We may not abdicate our duty to protect the constitution and our citizens by allowing law enforcement officers to engage in unconstitutional conduct simply because as law enforcement officers their hunches often payoff. The analysis under our constitution and under the federal constitution in search and seizure cases

should not be reduced to simply determining whether the appellant is suspicious in some broad, undefined context, but rather, whether the facts infer the required proof for the action to be taken, in other words, whether the required proof of reasonable suspicion or probable cause is present.

The majority decides this case by finding reasonable suspicion to justify the continued detention and canine sniff. The majority finds the required reasonable suspicion based upon the following facts:

1. Laime's lie about his criminal background;

2. Dodd's and Laime's ignorance or refusal to state their destination and names of friends they were to meet; and,

3. Laime's increasing agitation.

Other facts are discussed. The majority states Laime's invocation of his right against unlawful search and seizure cannot be the sole basis for probable cause to search, and then states the assertion of one's constitutional rights is not a weapon to be used against a suspect. What is stated is not clear and implies invoking one's constitutional rights is a fact that weighs in favor of reasonable suspicion. Other facts are also discussed. The majority wisely ignores Ramsey's assertion that reasonable suspicion may be based upon when someone chooses to eat snack foods. However, we ought to take special note of Ramsey's assertion about the snack foods, for it shows us ever more clearly his intent in this matter. Ramsey had a hunch, and it was a correct hunch. His intent was to stop the van and search it. Once Ramsey stopped the van, he attempted to develop facts to justify his detention of Laime and the search of the van.

In summary, the facts show Laime declined to divulge details of the trip, of his criminal past, and that he was nervous. Nothing about these facts has any tendency in fact to show there was any contraband in the van. The facts might infer Laime was nervous and felt he would only make things worse by divulging information, especially information about his past. They could infer Laime was frightened. Nervousness and agitation could mean any number of things. I don't believe these facts under any reasonable analysis can be argued to be "specific, particularized and articulable reasons indicating the person or vehicle may be involved in prohibited criminal activity." *Potter v. State*, 342 Ark. 621, 627, 30 S.W.3d 701

(2000). This is the required inference. The facts support no such conclusion nor any conclusion even close to reasonable suspicion.

The facts relied upon in this case do infer something. They infer something about Ramsey's conduct. We cannot ignore Ramsey's conduct as it relates to the alleged facts he gives in support of his continued detention of the van after his reason for stopping the van on the basis of a lack of registration was resolved. First, I note it is obvious any purpose in making a lawful stop based on a report from Texas that the van lacked current Texas registration was completed prior to appellants's detention and the execution of the canine sniff. This is clearly so because Ramsey told Laime and Dodd they were free to go. *United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998). Thus, in order to continue to detain appellants, there had to be events that transpired during the traffic stop that gave rise to reasonable suspicion. *Id.* Therefore, the court had to then determine whether Ramsey had a reasonable, articulable suspicion that appellant's van was carrying contraband or that other criminal activity may have been afoot. *Id.* While it is true that Ramsey's subjective intent in the stop will not invalidate the stop if there are other valid reasons for the stop, the facts developed during that stop do not support continued detention. Herein lies the majority's fundamental error in its analysis. The Fourth Amendment to the United States Constitution and the Arkansas Constitution will not allow the detention of the appellants on the basis that they were acting suspicious in Ramsey's subjective opinion. When all the pretense and fiction created by Ramsey is stripped away, it is facially apparent that the canine sniff was carried out because Ramsey wanted to search the van. That was his intent from the beginning. Ramsey asserts he stopped the van for impeding traffic flow; however, his own account contradicts that this could have been a valid concern. He states the van was traveling about 60 mph in a 70 mph zone while passing two tractor trailer rigs. He further states that none of the traffic in the area was moving at 70 mph. So we must ask at this juncture, where was the impediment to traffic? Ramsey notes that two vehicles were behind the subject van. He then asserts the van was holding them up. For authority he cites to Ark. Code Ann. § 27-51-301(b)(Supp. 2001), "driving continuously in the left lane. . . ." Obviously this was not occurring. Ramsey admits the van was passing the trucks. Ramsey, however, called in the license of the van and found it was not listed as registered. This gave him the right to stop the van. However, once that issue was resolved,

Ramsey detained them still based on the above noted facts. Testimony by Ramsey is conflicting, and does not support the conclusion that Ramsey had "specific, particularized and articulable reasons indicating the person or vehicle may be involved in prohibited criminal activity." *Potter*, 342 Ark. at 627.

The facts of this case are simple to understand. Ramsey stopped the van because he intended to search it. Ramsey asserts Laime was agitated. It seems so obvious that it need not be argued that an ordinary, reasonable person would rightfully become agitated when, without any cause whatever, he is asked by a law enforcement officer if he is carrying a dead body. Few of us would not be offended by an inference that we are a murderer, and most of us would be offended by baseless assertions that we are carrying drugs. That a person reacts in an expected and normal way to such accusations may not give rise to reasonable suspicion.

Next, the majority ought to consider that Ramsey feigned permission to leave after he completed his "investigatory" stop on Interstate 30. According to Ramsey, they were free to go. They could "walk or crawl," Ramsey told them, but they could not take their van. Ramsey's conduct showed that appellants were not free to leave. They were not free to leave because Ramsey intended to search the van.

We also ought to consider the request for consent to search. Ramsey's request for consent to a search was not a request. He did not ask if he could search and then move on to other questions relevant to his stop. He relentlessly pressed on. After Laime refused multiple verbal requests, Ramsey got out a consent form even though his requests had been rejected. Ramsey pressed on. Laime still denied the request. Ramsey still did not give up and respect the denial of his request. He began to try to read the form. Still Laime would not submit. Then Ramsey began to fill the form out. To what purpose? It was apparent Ramsey was hoping that by applying relentless pressure, Laime would submit to a search. Surely we have not reduced constitutional protections to only providing protection where the citizen, alone on the side of the road, has the courage to engage in an Olympic test of wills with law enforcement officers sworn to uphold the law and the Constitution. This decision leaves the citizens, who the Constitution is supposed to protect, to fend for themselves and to bear the burden of fighting off unrestrained law enforcement knowing that if they resist, their invocation of their constitutional rights will be interpreted as an admission of

guilt. One would hope we have moved beyond the grossly simplistic approach that a citizen will comply and allow a search because if he doesn't he must have something to hide. The Constitution is designed to protect the innocent from unlawful search and seizure. This court bears a duty to protect the Constitution. *Potter, supra.* Also, the constitutional guarantee against unlawful search and seizure must be construed in favor of the individual. *State v. Broadway,* 269 S.W.2d 215, 599 S.W.2d 721 (1980); *Lowery v. United States,* 128 F.2d 477 (8th Cir. 1942).

In the majority's decision, we learn that if someone lies about his criminal background when asked by police, is unable or unwilling to identify his destination and names of friends he is to meet, and seems agitated, that there is reasonable suspicion he is carrying contraband in his vehicle, or that he has committed or is about to commit a crime. There is nothing, taken individually, collectively, or in totality about these facts, that has any tendency to show anything was in the van or that a crime had been or was about to be committed. At most, they show the police officer had a nervous man before him who had a prior drug conviction. Nonetheless, these facts are found by this court to constitute the required "specific, particularized and articulable reasons indicating the person or vehicle may be involved in prohibited criminal activity." *See Potter,* 342 Ark. at 627. The facts provided are so woefully inadequate that a cursory review is all that is needed to show that the continued detention and canine sniff were unlawful. The facts are so amorphous that they mean nothing. The facts must be specific. The word specific means "precisely formulated or restricted, of an exact or particular nature." *The People v. C.T. Thomas,* 25 Cal. 2d 880, 898, 156 P.2d 7 (1945). There is nothing restricted or precise about these facts. Particular means "separate, single, specific, as opposed to general." *State v. Patterson,* 60 Idaho 67, 88 P.2d 493, 497 (1939). No particular facts inferring any criminal activity whatever are offered. Nothing about the facts in totality infers anything other than a nervous man who has a criminal background, which he is understandably not proud of. More is required of this court than such a mechanical review as is present here. So much time has passed since the decision in *Terry v. Ohio,* 390 U.S. 1 (1968) and similar cases under our own Constitution that discussion of this issue has digressed to lists of factors and facts from prior cases. This is misleading because the decision by the court must be based upon facts of the case that rationally infer a crime has been or is about to be committed. *Beck, supra.* The analysis has digressed to a conclusion of reasonable suspicion where a criminal defendant appears

merely suspicious in the opinion of law enforcement. Such conjectural suspicion is not sufficient. *Burris v. State*, 330 Ark. 66, 954 S.W.2d 209 (1997). An "inchoate and unparticularized suspicion or 'hunch' " will not suffice. *Potter,* 342 Ark. at 625-626 (citing *Terry v. Ohio,* 392 U.S. 1 (1968)). Nonetheless, in this case we allow a detention and search on a set of specious facts questionably and conflictingly presented by the officer, and cast aside fundamental constitutional rights.

This case should be reduced to its simplest terms so what this court is doing may be clearly understood. The majority finds the detention for the canine sniff was justified because Ramsey had a reasonable suspicion that a crime had been or was about to be committed. His testimony at the hearing varied fundamentally from his affidavit. His conduct shows he stopped the van to search it and everything else was an attempt to justify the detention and search. The facts in this case are abundantly clear. Ramsey saw a vehicle that fit his profile of one that he thought could be carrying drugs. He acted on a hunch. He stopped and search the van on that basis. Such an "inchoate and unparticularized suspicion or 'hunch' " will not suffice to support a search under the Fourth Amendment. *Potter v. State*, 342 Ark. at 625-626, (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).

For the above reasons I respectfully dissent.

CORBIN, J., joins in this dissent.