Shahid OMAR *v.* STATE of Arkansas

CA CR 06-1321 262 S.W.3d 195

Court of Appeals of Arkansas
Opinion delivered September 12, 2007

*Ron Fields*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *David R. Raupp*, Sr. Ass't Att'y Gen., for appellee.

S AM BIRD, Judge. Shahid Iman Omar was convicted in a jury trial of possession of drug paraphernalia and possession of cocaine with intent to deliver. He was sentenced on the respective convictions to concurrent sentences of forty and sixty years' imprisonment. Raising two points on appeal, he challenges the trial court's denial of his motion to suppress the cocaine and packaging found in the rental car that he was driving on October 1, 2005. First, he contends that the thirty-seven-minute traffic stop, ending with a dog sniff, exceeded the scope and duration permitted by state and federal law, regardless of whether reasonable suspicion justified an investigation of something other than his traffic violation for speeding. Second, he contends that the drug dog's entry into the car through an open window "rendered any alert suspect to establish probable cause" and that the entry itself constituted a search without probable cause. We disagree with his arguments, and we affirm.

Omar asserts that his detention was improper under state and federal case law, as well as Rule 3.1 of the Arkansas Rules of Criminal Procedure. In reviewing a circuit court's denial of a motion to suppress evidence, the appellate court conducts a de novo review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court. *Sims v. State*, 356 Ark. 507, 157 S.W.3d 530 (2004). The circuit court's

ruling is reversed only if it is clearly against the preponderance of the evidence. *Yarbrough v. State*, 370 Ark. 31, 257 S.W.3d 50 (2007).

Arkansas Rule of Criminal Procedure 3.1 provides:

A law enforcement officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit (1) a felony, or (2) a misdemeanor involving danger of forcible injury to persons or of appropriation of or damage to property, if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct. An officer acting under this rule may require the person to remain in or near such place in the officer's presence for a period of not more than fifteen (15) minutes or for such time as is reasonable under the circumstances. . . .

As part of a valid traffic stop, a police officer may detain the motorist while the officer completes routine tasks related to the traffic violation, such as making computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing of a citation or warning. *Laime v. State*, 347 Ark. 142, 60 S.W.3d 464 (2001). The officer may ask routine questions such as the party's destination, the purpose of the trip, and whether the officer may search the vehicle; the officer then may act on whatever information is volunteered. *Id.*

Rule 3.1's alternative time period of "such time as is reasonable under the circumstances" is not restricted to a specific number of minutes. *Yarbrough v. State, supra.* After the routine tasks are completed, continued detention of the driver can become unreasonable unless the officer has a reasonably articulable suspicion for believing that criminal activity is afoot. *Sims v. State*, 356 Ark. 507, 157 S.W.3d 530 (2004). Only what the officer knew at the time of the detention enters the analysis of whether the officer had reasonable suspicion to conduct investigative detention; after-acquired knowledge is irrelevant. *Laime, supra.*

After the legitimate purpose for an initial traffic stop has ended, the officer may conduct a canine sniff of the motorist's vehicle if the officer possesses reasonable suspicion that a person is committing, has committed, or is about to commit a felony or a misdemeanor involving danger to persons or property. *Malone v.*

*State*, 364 Ark. 256, 217 S.W.3d 810 (2005) (citing Ark. R. Crim. P. 3.1); *see also Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (stating that a seizure justified solely by an interest in issuing the driver a warning ticket can become unlawful if prolonged beyond the time reasonably required to complete that mission).

## The Thirty-Seven-Minute Detention

Omar contends that, regardless of whether reasonable suspicion justified an investigation of something other than the traffic violation, the thirty-seven-minute traffic stop exceeded the scope and duration permitted by state and federal law. This detention began at 6:52 p.m. when Officer Jason Aaron of the Arkansas State Police stopped Omar for speeding. It ended at 7:29 p.m. when Sgt. Kyle Drown walked his dog around the car, leading to the discovery of cocaine in a door panel.

Omar challenges the trial court's findings that, within a few moments of the stop, Officer Aaron developed a reasonable suspicion that a felony was being committed; that the delay beyond fifteen minutes "was caused by the only canine sniffing dog [being] miles away"; and that the delay was reasonable under the circumstances. He argues that no reasonable suspicion existed to justify the expanded investigation and the continued detention to conduct the canine sniff. Alternatively, he argues that, even if reasonable suspicion existed, the means by which the investigation was conducted were unreasonable in scope and duration.

Officer Aaron testified that in 2005 he was assigned highway patrol duties in Crawford County, where he "worked Interstate 40 and 540 for interstate transportation of drugs." On the evening of October 1, 2005, he turned on his blue lights after clocking a Crown Victoria at seventy-nine miles an hour in a seventy-mile-an-hour zone on I-40 near Alma. A DVD recording of the stop was made.

Officer Aaron approached the passenger side of the car when it pulled over, and he smelled a strong odor of air freshener coming from within the vehicle. He observed that Omar was the car's sole occupant; there were fast-food wrappers scattered in the front passenger seat, a new cell phone on the center armrest, a small black bag in the left rear seat, and clothes hanging up in the car. Aaron told Omar that the car had been going seventy-nine and asked to see a driver's license, insurance, and registration.

Omar's hands were trembling and fumbling through his paperwork. A rental contract showed that the car had been rented

at 1:09 p.m. the previous day at Los Angeles International Airport and was to be turned in two days afterward at Baltimore, Maryland. Aaron asked Omar where he had been, and Omar answered that he had come from Los Angeles after flying there to attend a cousin's Saturday wedding. When Aaron pointed out that "today is Saturday," Omar said instead that the wedding was Friday, he flew out Friday for the evening wedding, and he rented the car for the return trip because his flight had been rough.

After running driver's license and criminal checks, Aaron asked Omar if he had ever been arrested; Omar stated that a gun charge was the only thing he had. Five to ten minutes into the traffic stop, Aaron asked several times for permission to search the car and asked if Omar was transporting anything illegal. At 7:00 Omar refused permission to search. Aaron, telling Omar that a drug dog was being requested, telephoned the request to dispatch. At 7:04 Aaron informed Omar that a canine was in route. Aaron asked Omar the specifics about an arrest for murder, and Omar apparently responded that the murder conviction had been overturned. The criminal check had revealed previous charges of attempted murder, accessory to murder, armed robbery, and handgun violation.

Aaron asked further questions about the wedding, but Omar was not able to give specifics such as when or where it took place. He also said that it had been Friday morning and he had not attended the reception, then he said that he went to the first of the reception but left because of his hurry to get home, and he mentioned that he was a working man on a car lot who drove for a living. Aaron asked for the cousin's phone number to verify the truth about the wedding, but Omar was unable to recall the number and asked to get his phone out of the car. At 7:09 Aaron informed Omar that he was being issued a citation for speeding and would be free to go if the dog did not alert. They waited for the only canine available at the time. Around 7:15 Omar signed for the citation; the dog arrived about twenty-five minutes after Omar had been told that he would be free to go absent an alert.

Aaron testified that, because of the conflicting information of criminal history, he believed that Omar was trying to deceive him. Aaron was becoming suspicious four minutes into the stop, as the stop went on his suspicions of criminal activity rose, and by 7:04 he had a belief of criminal activity, albeit unspecified. He referred in his testimony to Omar's continued nervousness and evasive answers, his itinerary of flying to Los Angeles (described by

Aaron as "a source city") and driving the rental car the long distance to Maryland, and Omar's changing stories about the wedding's day and time. Aaron said that Omar's renting a car did not make sense to him with the hurry to get home by Monday, the costs of car rental around $400 and $3-a-gallon gas, and a return by air being much cheaper and quicker. Another basis for Aaron's suspicion was the presence of the cell phone along with the air freshener: drug offenders had told him that new cell phones are given to individuals to help track cross-country shipments of narcotics and weapons.

Sergeant Kyle Drown was in Sebastian County at Fort Chaffee when he received Aaron's request for a canine, but his dog was at Drown's apartment in Van Buren. In order to speed things up, he had his wife bring the dog to the interstate site. The two cars arrived at the same time. Drown took the dog straight to Omar's car to begin the sniff, which quickly resulted in the discovery of the cocaine.

The genesis for Rule 3.1 is the holding of *Terry v. Ohio*, 392 U.S. 1 (1968), that a police officer can detain a person without violating the Fourth Amendment if the officer has a reasonable suspicion that "criminal activity may be afoot." *Laime v. State*, 347 Ark. 142, 60 S.W.3d 464 (2001). In assessing whether a detention is too long in duration to be justified as an investigative stop, it is appropriate to examine whether police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. *United States v. Sharpe*, 470 U.S. 675, 686 (1985). The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it. *Id*. at 687. Courts must "consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994) (quoting *Sharpe*, 470 U.S. at 685). "When police need the assistance of a drug dog in roadside *Terry* stops, it will in general take time to obtain one; local government police forces and the state highway patrol cannot be expected to have drug dogs immediately available to all officers in the field at all times." *Id*.

Here, our totality-of-the-circumstances review includes the following: (1) Omar's itinerary of flying to Los Angeles from Baltimore but returning by rental car, despite his desire to hurry home; (2) his changing stories about the time and location of

the wedding; (3) his admission to only one previous criminal charge, while the criminal check revealed three others; (4) the cell phone and air freshener in his rental car; (5) a small black bag but no wedding clothes visible on the back seat; and (6) his evasive answers and continued nervousness. We conclude from these factors that Officer Aaron had specific, particular, and articulable reasons to extend the detention beyond the initial traffic stop, giving him reasonable suspicion of criminal activity to detain Omar further for a canine sniff of the car.

■ Aaron's suspicions began in the first four minutes of stopping Omar, and they steadily grew. The officer acted diligently to verify his suspicions as quickly as possible. He radioed for the drug dog only about twelve minutes into the stop, but the only available dog was in Van Buren and his handler was at Fort Chaffee. The handler drove from Fort Chaffee and arranged for his wife to bring the dog to him on the interstate near Alma, where Aaron had stopped Omar and was awaiting their arrival. Under the facts of this case, the canine arrived without undue delay and the thirty-seven-minute detention was not unreasonable. *Cf. Bloomfield* (finding that a one-hour period was not unreasonable to wait for a drug dog).

### Illegal Search

As his second point on appeal, Omar contends that the drug dog's entry into the car through an open window constituted an improper search without probable cause and was not an alert establishing probable cause to search. The argument he presents was preserved for our review through arguments and rulings that followed the circuit court's denial of his pretrial motion to suppress.

On the morning of trial, and before jury selection, Omar orally moved to amend his motion to suppress as follows:

> Part of the video depicted the drug dog going around Mr. Omar's car, jumping through the window. The handler said that he alerted — a strong alert. . . . [W]e'd like to amend our motion to suppress to the extent that we hadn't already made this argument and argue that it was not an alert when he [came] through the passenger window. It was a dog out of control, who just jumped through; and, therefore, they were inside the car without probable cause. It wasn't just a walk-around search. Like I said, the dog either jumped in, or he was directed to jump in, and they were searching the interior of the car without probable cause.

The State said that it had no objection to this additional ground. The court ruled, "[T]his is an aggressive alert dog, and that's probably the strongest alert I've ever seen. Your amendment is allowed. It is rejected as far as it goes to your motion to suppress. . . . Typically, it's just a dog raising its paw." The court subsequently denied Omar's motion to suppress after jury selection and, again, just before the cocaine and packing that Omar sought to suppress were introduced at trial.

We agree with the State's contention that the circuit court did not clearly err in ruling that the canine alerted before it entered the vehicle, thus establishing probable cause for the entry of the vehicle. Evidence introduced at the suppression hearing revealed that at 7:29 p.m. the dog, Rudy, arrived with his handler, Sgt. Drown. On their first walk-around of the car, Rudy jumped in through the window of the right, front passenger window. Within a minute, Drown opened a back door and pulled the dog out. Drown and Officer Aaron began searching the car and its trunk.

Drown testified that he had been Rudy's handler since 1999, that they were re-certified as a team each year, and that Rudy was trained to detect heroin, marijuana, cocaine, and methamphetamine. Drown, who normally handled calls in Sebastian County rather than Crawford County, received Officer Aaron's request at 7:03 and drove through traffic out of Fort Chaffee while evacuees from Hurricane Katrina were there. Rudy had not been trained as regularly as in the past because Drown had been moved into a supervisor's position at Fort Chaffee and did not have him on a full-time basis, but there had been no break in certification and Rudy was still in service when Drown testified.

Regarding the initial walk-around of Omar's vehicle, Drown stated:

> [W]hen we got to the right, front passenger door, the dog did a head turn, indicating that the odor of narcotics was present. He then gave an abnormal response by jumping through the window of the vehicle. He then went to the back seat, down to the area, where the seat and the door meet and indicated by scratching to the odor of narcotics being present.

Drown said that Rudy did not normally jump through windows, but Drown had no doubt that Rudy "alerted on the vehicle" when he turned his head, jumped through the window, and scratched inside

the car. Drown said that Rudy was trying to go to the source of the odor by making his way to the back seat, where the seat and door came together.

Drown testified that he again walked Rudy to the front of the vehicle, they went around the driver's side, and Rudy "indicated" on the left rear window by standing and scratching. Drown said that Rudy would not jump through the window or up on the vehicle if the odor of narcotics had not been present. He said that he had no reason to doubt Rudy's efficiency or proficiency, despite the lack of recent work.

Drown said that Rudy was an aggressive alert dog, which shows an alert by scratching and biting. Drown also testified that, upon reaching the passenger window, "the canine did a head turn, which is an alert, that he's alerting to the odor of narcotics being present in the vehicle. At that point, he did, what I call, an abnormal response." He said that Rudy's head turn at the door is called an alert, or a change in behavior; that jumping through the window was an abnormal response; but that Rudy was not trained to avoid jumping into a vehicle and was trying to go to the source of the odor. Drown had no doubt that Rudy alerted.

Drown searched the inside of the vehicle and he observed tool marks on screw heads of the back passenger door. He pulled the door panel off and observed two wrapped bundles, which were the subject of Omar's motion to suppress.

A dog's "instinctive" entry into a car does not constitute police misconduct requiring suppression of the evidence. *United States v. Stone*, 866 F.2d 359 (10th Cir. 1989). In the absence of evidence that police asked a defendant to open the hatchback to enable the dog to jump in and of the handler's encouraging the dog to jump in, the dog's instinctive actions did not violate the Fourth Amendment on the dog's first entry into the car. *United States v. McKoy*, 06-032, slip op. at 1 (D.D.C. Apr. 19, 2007) (citing *Stone*).[1]

 We reject Omar's argument that the drug dog's entry into the car through an open window constituted an improper search without probable cause and was not an alert establishing probable cause to search. The circuit court's finding that Rudy was an aggressive alert dog and that the jump through the window was

---

[1] *Stone*, however, did not relieve the police of their responsibility to restrain the leashed dog during a second scan.

"probably the strongest alert" the court had ever seen was well supported by the canine handler's testimony. There was no clear error in the trial court's finding.

Affirmed.

MARSHALL and HEFFLEY, JJ., agree.