Billy T. SIMS, Jr. *v.* STATE of Arkansas

CR 03-63 157 S.W.3d 530

Supreme Court of Arkansas
Opinion delivered April 1, 2004

[Rehearing denied May 6, 2004.]

*Daniel G. Ritchey*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Valerie L. Kelly*, Ass't Att'y Gen., for appellee.

Tom Glaze, Justice. This appeal involves a substantial question of law concerning the interpretation of Rule 3.1 of this court's Rules of Criminal Procedure. Specifically, the appeal requires us to determine the extent to which an officer, during a traffic stop, may detain a person whom the officer suspects of committing a separate, drug-related offense. In early 1998, Blytheville Chief of

Police Jesse King wrote to the Director of the Arkansas State Police, Colonel John Bailey, seeking permission for the Blytheville Police Department to patrol along portions of Interstate 55 that run through the Blytheville city limits. Colonel Bailey wrote back, giving that permission, in April of 1998. Following that exchange, the Blytheville Police Department formed an "Aggressive Criminal Enforcement Team," ("ACE Team"), which was formed to interrupt the flow of drugs through Blytheville. Officers were assigned to work this stretch of interstate beginning in mid-2000.

The record and testimony show that on July 17, 2001, Officers Daniel Willey and Beverly Alexander were patrolling the Interstate around mile marker 67, when they saw a Chevy Tahoe traveling northbound. Willey believed the vehicle "might be impeding traffic." As Officer Willey made a U-turn across the median and pulled in behind the vehicle, he noticed that its left rear brake light was out, so he had the driver pull over.

Willey walked up to the driver's side of the car and spoke to the driver, appellant Billy Sims; he told Sims that he had pulled him over because of the defective brake light. Sims said that he wanted to see for himself, and got out of his vehicle to look. Willey described Sims as appearing nervous and not listening to what Willey was telling him. Sims eventually asked his passenger, a Mr. Kimbrough, to step on the brakes to see if the light was out. Willey observed that Sims was beginning to sweat. Sims then stated that he had just been at Wal-Mart to look at a swing set; Willey thought this statement was strange. Willey asked Sims where he was going, and Sims, who had Illinois tags on his car, replied that he had picked up a friend in Mississippi who was going to do some yard work for him. Kimbrough, on the other hand, said that he was traveling with his "brother." When Willey asked Sims's passenger, Kimbrough, for identification, Kimbrough could only produce a birth certificate. Officer Alexander wrote up a warning, citing Sims for having a defective brake light. Alexander had also run a criminal history check on both Sims and Kimbrough, which revealed that both men had prior drug arrests, although the officers did not know a time frame on those arrests. Officer Willey then returned Sims's identification information to him and let him start walking back to the vehicle, because the "traffic stop was done."

At that point, however, Willey proceeded to ask Sims if Sims had anything illegal in his vehicle. Sims replied that he did not, but as he was returning to his car, Willey asked, "Would you give me consent to search your vehicle?" According to Willey, Sims

responded, "I don't have anything illegal in the vehicle. I don't have time for you to search." That response raised Willey's suspicions, and Willey decided to "hold him there long enough to run the dog."

Willey then had Sims and Kimbrough step aside, and Alexander brought the drug dog to Sims's car. The dog alerted on the car, and Willey again asked if there was anything illegal in the vehicle. Sims said that there was none that he knew of. Willey's comments to Sims following this exchange were captured on a videotape from Willey's police car:

> Okay. Well, what we're going to do is, the drugs, the canine alerted on your vehicle, so there's some kind of narcotics in the vehicle or has been narcotics in the vehicle. What we're gonna do — I don't need your consent to search the vehicle anymore, okay? Once the canine alerts and tells us there's been something in the vehicle or is something in the vehicle, then we search it, okay? What we're going to do is go ahead and search the vehicle. I want to know [*inaudible*] is there anything in there [*inaudible*]?

Willey's subsequent search of the car turned up thirteen grams of cocaine. At the suppression hearing, Willey testified that less than two minutes elapsed between the time Sims denied consent to search and when the dog alerted. The officers arrested Sims and charged him with possession of a controlled substance with intent to deliver.

The suppression hearing in Sims's case was combined with three other defendants who had experienced similar encounters with the ACE Team on the same stretch of Interstate 55 through Blytheville. After the hearing, the trial court granted two of the four defendants' motions to suppress. Sims's motion was denied, but the judge expressed serious reservations about the police officers' tactics in conducting the searches. Sims then entered a conditional guilty plea pursuant to Ark. R. Crim. P. 24.3(b); he was sentenced to 126 months' imprisonment, with an additional five years suspended.

On appeal, he first argues that the trial court erred in denying his motion to suppress. In reviewing the trial court's denial of a motion to suppress evidence, we conduct a *de novo* review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause,

giving due weight to inferences drawn by the trial court. *Cummings v. State*, 353 Ark. 618, 110 S.W.3d 272 (2003); *Davis v. State*, 351 Ark. 406, 94 S.W.3d 892 (2003).

Sims begins his argument by contending that the totality of the circumstances makes it clear that the officers on the ACE Team are "randomly stopping motorists in pursuit of a general scheme (searching for drugs) without individualized suspicion." He submits that the actions of Officers Willey and Alexander in pulling him over amounted to a pretextual stop. Sims further asserts that, under Ark. Const. art. 2, § 15 and *State v. Sullivan*, 348 Ark. 782, 74 S.W.3d 215 (2002), Arkansas provides greater protection from unreasonable searches and seizures than does the Fourth Amendment.

 We first note that the officers' initial decision to pull Sims over was entirely legal. In order for a police officer to make a traffic stop, he must have probable cause to believe that the vehicle has violated a traffic law. *Laime v. State*, 347 Ark. 142, 60 S.W.3d 464 (2001); *Travis v. State*, 331 Ark. 7, 959 S.W.2d 32 (1998). Whether a police officer has probable cause to make a traffic stop does not depend on whether the driver was actually guilty of the violation which the officer believed to have occurred. *Laime*, 347 Ark. at 153; *Travis*, 331 Ark. at 10. Here, Willey testified at the suppression hearing that, when he first saw Sims's vehicle, he believed it was obstructing traffic in the left lane. *See* Ark. Code Ann. § 27-51-301(b) (Supp. 2003).[1] In addition, once Willey had pulled in behind Sims, he observed that the left taillight and brake light of the Tahoe was not functioning, which is a violation of Ark. Code Ann. § 27-36-216(a) & (b) (Repl. 2004).[2] Thus, there is nothing inherently unconstitutional or invalid about the initial traffic stop.

 The next issue is the validity of Willey's subsequent detention of Sims. Under Ark. R. Crim. P. 3.1, a detention without arrest may transpire under certain circumstances:

A law enforcement *officer lawfully present in any place may*, in the performance of his duties, *stop and detain any person who he reasonably*

---

[1] Section 27-51-301(b) provides that "[m]otor vehicles shall not be operated continuously in the left lane of a multilane roadway whenever it impedes the flow of other traffic."

[2] These statutes mandate that motor vehicles be equipped with "a stop lamp or lamps on the rear of the vehicle," § 27-36-216(a)(1), and "lamps showing to the ... rear for purposes of indicating an intention to turn either to the right or left." § 27-36-216(b)(1).

> *suspects is committing,* has committed, or is about to commit *(1) a felony, or (2) a misdemeanor involving danger of forcible injury to persons or of appropriation of or damage to property,* if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct. An officer acting under this rule may require the person to remain in or near such place in the officer's presence for a period of not more than fifteen (15) minutes or for such time as is reasonable under the circumstances. At the end of such period the person detained shall be released without further restraint, or arrested and charged with an offense.

(Emphasis added.) The rule is precise in stating that the reasonable suspicion must be tied to the commission of a felony or a misdemeanor involving forcible injury to persons or property. *Brazwell v. State,* 354 Ark. 281, 119 S.W.3d 499 (2003) (citing *Laime, supra*).

█ █ Our criminal rules further define "reasonable suspicion" as "a suspicion based on facts or circumstances which of themselves do not give rise to the probable cause requisite to justify a lawful arrest, but which give rise to more than a bare suspicion; that is, a suspicion that is reasonable as opposed to an imaginary or purely conjectural suspicion." Ark. R. Crim. P. 2.1. In *Laime, supra,* this court held that "whether there is reasonable suspicion depends on whether, under the totality of the circumstances, the police have specific, particularized, and articulable reasons indicating that the person may be involved in criminal activity." *Laime,* 347 Ark. at 155.

In the present case, although the trial court denied Sims's motion to suppress, the court specifically found that Officers Willey and Alexander did not have a reasonable suspicion based on the facts or circumstances that Sims was committing a crime, and therefore, Sims's rights were violated by the continued detention. We agree.

█ Although Officers Willey's and Alexander's initial traffic stop of Sims was permissible, the analysis must focus on what happened *after* Willey handed Sims back his driver's license and registration, along with a warning for having a broken tail light; it was at this point that the legitimate purpose of the stop had terminated. This court has held with respect to the issue of whether probable cause to arrest exists that (1) after-acquired knowledge is irrelevant to the probable cause analysis, and (2) only

what the police officer knew at the time of arrest enters the analysis. *Laime, supra; Friend v. State,* 315 Ark. 143, 865 S.W.2d 275 (1993) (citing *Beck v. Ohio,* 379 U.S. 89 (1964)). The same principle holds true with respect to a decision on whether to detain under Rule 3.1. *Laime, supra.*

 It is true that, as part of a valid traffic stop, a police officer may detain a traffic offender while the officer completes certain routine tasks, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning. *See Laime,* 347 Ark. at 157-58 (citing *United States v. Carrazco,* 91 F.3d 65 (8th Cir. 1996)). During this process, the officer may ask the motorist routine questions such as his destination, the purpose of the trip, or whether the officer may search the vehicle, and he may act on whatever information is volunteered. *Id.* at 158. However, after those routine checks are completed, unless the officer has a reasonably articulable suspicion for believing that criminal activity is afoot, continued detention of the driver can become unreasonable. *See United States v. Beck,* 140 F.3d 1129 (8th Cir. 1998) (citing *United States v. Mesa,* 62 F.3d 159 (6th Cir. 1995)); *United States v. $404,905.00 in U.S. Currency,* 182 F.3d 643 (8th Cir. 1999). In *Mesa, supra,* the Sixth Circuit stated that "[o]nce the purposes of the initial traffic stop were completed, there is no doubt that the officer could not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention." *Mesa,* 62 F.3d at 162. Similarly, the Tenth Circuit has held that, in the absence of a reasonable, articulable suspicion of some drug-related criminal activity, once the purpose of the traffic stop is completed, the operator of the vehicle should be allowed to proceed on his way, without being subject to further delay by police for additional questioning. *United States v. Wood,* 106 F.3d 942, 945 (10th Cir. 1997).

 As noted above, the trial court specifically found that Willey did not possess particular facts, whether taken singularly or as a whole, that would have given rise to an objective and particularized basis for a reasonable suspicion of criminal activity like that required by Rule 3.1, as set out above. Although Willey testified that Sims appeared nervous and was sweating, this court has held that mere nervousness cannot constitute reasonable sus-

picion of criminal activity and grounds for detention. *See Laime*, 347 Ark. at 159. Further, there is nothing odd or unusual or suspicious about Sims's sweating, as the traffic stop occurred in the middle of July. Similarly, Willey asserted that Sims's "strange" comment about having just come from Wal-Mart made him suspicious, but this comment could have been merely a nervous attempt at conversation. Again, nervousness does not automatically give rise to reasonable suspicion.[3] In sum, the trial court found Willey had no particular facts in his possession that would have given rise to an objective and particularized basis for a reasonable suspicion of criminal activity. Therefore, the continued detention of Sims after the legitimate purpose of the traffic stop had ended was a violation of Rule 3.1.

In conclusion, we recognize that the Supreme Court has held that a dog sniff is not a "search" within the meaning of the Fourth Amendment, *see United States v. Place*, 462 U.S. 696 (1983) (concluding that a dog sniff is "*sui generis*"), and that our court of appeals has determined that a canine sniff of the exterior of a vehicle does not amount to a Fourth Amendment search. *See Miller v. State*, 81 Ark. App. 401, 102 S.W.3d 896 (2003); *Willoughby v. State*, 76 Ark. App. 329, 65 S.W.3d 453 (2002); *Vega v. State*, 56 Ark. App. 145, 939 S.W.2d 322 (1997). However, we are concerned here with the fact that Willey, in the absence of any reasonable suspicion, unlawfully detained Sims beyond the permissible limits of Rule 3.1. None of the three court of appeals cases cited above mentions Rule 3.1 or analyzes the relevant issues in light of that rule. Furthermore, we do not disagree that a canine sniff of the exterior of a vehicle is not a Fourth Amendment search. Instead, we conclude only that, once the legitimate purpose of a valid traffic stop is over, an officer must have, in accordance with Rule 3.1, a reasonable suspicion that the person he has stopped is committing, has committed, or is about to commit a felony or a misdemeanor involving danger to persons or property. Addition-

---

[3] We also note that, at the suppression hearing, Willey initially testified that when Sims denied consent to search the vehicle, Willey felt he had "something there besides a traffic stop" and felt that he had "reasonable suspicion to detain him." Willey quickly retracted that statement, saying that Sims's refusal to consent to a search would not give rise to a reasonable suspicion to detain Sims. Of course, one's invocation of his Fourth Amendment rights cannot be the sole basis for probable cause to search. *See Laime*, 347 Ark. at 158 (citing *Florida v. Bostick*, 501 U.S. 429 (1991)).

ally, under Ark. R. Crim. P. 2.1, "reasonable suspicion" means a suspicion based on facts or circumstances that give rise to more than a bare suspicion, not an imaginary or purely conjectural suspicion. The facts of this case are clear that Officer Willey did not have a specific, particularized, and articulable reason indicating that Sims was involved in any drug-related criminal activity. Therefore, we hold that the trial court erred in denying Sims's motion to suppress.

Sims raises a second point on appeal, namely, that the trial court erred in denying his motion to present additional evidence that he claimed was relevant to proving that the Blytheville Police were consistently stopping motorists along Interstate 55 without individualized suspicion. Because we reverse on his first point, it is unnecessary to reach or discuss his second argument on appeal.