James Thomas BURKS *v.* STATE of Arkansas

CR 03-1276                                    210 S.W.3d 62

Supreme Court of Arkansas
Opinion delivered June 9, 2005

[Rehearing denied September 8, 2005.*]

*John Wesley Hall, Jr.,* for appellant.

*Mike Beebe,* Att'y Gen., by: *Vada Berger,* Ass't Att'y Gen., for appellee.

---

* HANNAH, C.J., and GLAZE and IMBER, JJ., would grant rehearing.

BETTY C. DICKEY, Justice. Appellant James Burks was convicted of possession with intent to deliver marijuana, sentenced to a prison term of twenty years, and fined fifty thousand dollars. Before trial, he moved to suppress drug evidence that the police had seized from his car after a traffic stop on an interstate highway. The trial court denied the motion, and Burks now appeals. He argues that the traffic stop was invalid, either because it was not supported by probable cause or because it was the product of racial profiling, and that his continued detention while the police ran a drug dog around his car was unreasonable in violation of the Fourth Amendment and Ark. R. Crim. P. 3.1 (2004). We affirm.

Arkansas State Trooper Olen Craig and Deputy Matthew LaMora with the Crawford County Sheriff's Department testified to the following set of facts. At 2:56 in the morning, Craig and LaMora were parked on the side of the highway when they saw Burks drive off the left side of the road before swerving over to exit on the right. Concerned that he might be intoxicated, Craig followed Burks to a gas station but was unable to determine if he was impaired. He radioed LaMora, who was now parked near the entrance to the highway, and suggested that he watch for Burks' car. When Burks re-entered the highway, LaMora began to follow him. About a quarter of a mile later, he failed to obey a "Merge Now" sign, and LaMora pulled him over.

Burks handed LaMora his license and the rental agreement for the car that he was driving. The rental agreement specified that the car was due to be returned the day before and that it was not to be driven outside of California and Arizona, but Burks told LaMora that he was driving east to visit New York City. Burks appeared anxious to LaMora and evasive with his answers. LaMora went to his patrol car, ran a check on Burks' license and discovered that he had been arrested for a firearms offense. Returning to Burks, LaMora handed him a warning ticket and asked him if he would consent to a search of his car. When Burks refused, LaMora advised him that he was going to run a drug dog around the outside of the vehicle. The dog alerted around the rear of Burks' car; LaMora opened the trunk and found seventy pounds of marijuana inside.

Burks first argues that the traffic stop is invalid because it was not supported by probable cause. In order to make a valid traffic stop, a police officer must have probable cause to believe that a traffic law has been violated. *Laime v. State,* 347 Ark. 142, 60 S.W.3d 464 (2001). Probable cause is defined as "facts or circum-

stances within a police officer's knowledge that are sufficient to permit a person of reasonable caution to believe that an offense has been committed by the person suspected." *Id.* Here, LaMora testified that he saw Burks drive past a "Merge Now" sign without merging. Failing to obey a traffic control device is a violation of Ark. Code Ann. § 27-52-103 (Repl. 1994). Burks' traffic stop was supported by probable cause and was legally valid.

■ Burks also argues that the traffic stop was invalid because it was the product of racial profiling. Citing *State v. Segers*, 172 N.J. 481, 799 A.2d 541 (2002), he asserts that he made a prima facie case of racial motivation for the stop based on police statistics from Crawford County, and that the State failed to meet its burden of providing a race-neutral reason. The trial court, however, never made a ruling on the statistics, and this court has repeatedly stated that we will not address an issue that was not ruled on by the court below. *State Farm Fire & Casualty Company v. Ledbetter*, 355 Ark. 28, 129 S.W.3d 815 (2003).

Burks next argues that, even if the initial traffic stop were valid, the drug evidence should nonetheless be suppressed because he was unreasonably detained while LaMora ran the drug dog around his car. Ark. R. Crim 3.1 (2004) addresses the validity of a detention without arrest:

> A law enforcement officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit . . . a felony. . . . An officer acting under this rule may require the person to remain in or near such place in the officer's presence for a period of not more than fifteen (15) minutes or for such time as is reasonable under the circumstances. At the end of such period the person detained shall be released without further restraint, or arrested and charged with an offense.

Reasonable suspicion is a "suspicion based on facts or circumstances which of themselves do not give rise to the probable cause requisite to justify a lawful arrest, but which give rise to more than a bare suspicion; that is, a suspicion that is reasonable as opposed to an imaginary or purely conjectural suspicion." Ark. R. Crim P. 2.1. Reasonable suspicion depends on objective facts, and it exists when "under the totality of the circumstances, the police have specific, particularized, and articulable reasons indicating that the person may be involved in criminal activity. *Laime,* 347 Ark. at 155. An officer

making a traffic stop must develop reasonable suspicion to detain before the legitimate purpose of the traffic stop has ended. *Sims v. State*, 356 Ark. 507, 157 S.W.3d 530 (2004).

This court addressed similar issues in *Laime v. State*, 347 Ark. 142, 60 S.W.3d 464 (2001), and *Sims v. State, supra*. In *Laime*, the police pulled over a van for driving below the speed limit in the left lane. When the police officer separately asked the van's driver and its passenger where they were going, both said that they were driving to Little Rock to have dinner with some friends, but each said that the other knew who the friends were and where they were to meet them. *Id.* The van's driver became more nervous and agitated as the traffic stop progressed and became quite angry when the police asked permission to search the vehicle. *Id.* In addition, a background check revealed a drug conviction that the driver had previously denied having. This court held that these facts gave rise to reasonable suspicion. *Id.*

In *Sims, supra*, during a valid traffic stop made midday, the police noticed that the driver was nervous and sweating and thought it was strange that he volunteered an odd comment about having just been to Wal-Mart to buy a swing set. After telling Sims that the traffic stop was over, the police then decided to run a drug dog around the car. We held that reasonable suspicion to detain did not exist, primarily because nervousness alone does not give rise to reasonable suspicion. *Id.*

This case is more like *Laime* than *Sims*. Although LaMora noticed that Burks appeared nervous and agitated, this observation was not the sole basis of his decision to detain. The rental agreement that Burks handed LaMora specified that the car was not to be driven outside of California and Arizona and that it was due to be returned in California the day before the traffic stop occurred. Burks was not only driving the car outside of the permitted states, he was half a continent away, heading in the opposite direction, and doing so the day after the car should have been returned. The State suggested at oral argument that this could have given LaMora reason to suspect that the vehicle was stolen. Under the totality of the circumstances, we hold that these facts establish "specific, particularized, and articulable reasons" that criminal activity was afoot.

This case is distinguishable from *Lilley v. State*, 362 Ark. 436, 208 S.W.3d 735 (2005). In *Lilley*, we focused on when the traffic stop was over and held that reasonable suspicion did not exist based

on the fact that Lilley was nervous, his car smelled like air freshener, the rental agreement was for one-way travel, and the car was rented in another person's name, although Lilley was listed as an additional driver. Taken as a whole, these facts are seemingly innocent. In contrast, the facts in the present case at the time the traffic stop was over suggested that the rental car had been stolen because it was not only overdue but was also being driven far away from the area in which it was meant to be returned.

█ Finally, Burks maintains that the use of a drug dog violates the prohibition against unreasonable searches and seizures found in the Fourth Amendment of the United States Constitution and Article 2, section 15 of the Arkansas Constitution. The use of a drug dog during a traffic stop does not constitute an illegal search under the federal constitution. *Illinois v. Caballes*, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). Because we hold that law enforcement had reasonable grounds to detain, we do not address whether a dog sniff is an illegal search under the state constitution.

Affirmed.

HANNAH, C.J., GLAZE and IMBER, JJ., dissent.

TOM GLAZE, Justice, dissenting. This case is hopelessly in conflict with several decisions this court has handed down in recent months, but the court, for whatever reason, is reluctant to apply and follow those controlling legal precedents now.

At issue in this case is whether police officers can continue to detain a person — properly stopped for a traffic offense — *after* the officer completed certain routine tasks, such as computerized checks of the vehicle's registration and the driver's license, as well as the driver's criminal history and the issuance of a citation or warning. This court has, in clear language, held "no." *See Sims v. State*, 356 Ark. 507, 157 S.W.3d 530 (2004). In *Sims*, this court, relying on Ark. R. Crim. P. 3.1,[1] held that, once the legitimate purpose of a valid traffic stop is over, an officer must have *a*

---

[1] Arkansas Rule of Criminal Procedure 3.1 (2004) states, in pertinent part, as follows:

A law enforcement officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit . . . a felony . . . . An officer acting under this rule may require the person to remain in or near such place in the officer's presence for a period of not more than fifteen (15) minutes or for such time as is reasonable under

*reasonable suspicion* that the person he stopped is committing, has committed, or is about to commit (1) a felony or (2) a misdemeanor involving danger to persons or property.[2]

In *Sims*, our court reviewed the facts leading up to Sims's arrest, and held that nothing more than mere conjecture connected Sims with the commission of any felony or a misdemeanor involving forcible injury to persons or property. The officers' testimony in *Sims* showed the following:

(1) Officer Daniel Willey "pulled Sims over" because of a defective brake light. Sims was described as appearing nervous and not listening to what Willey was telling him when Sims got out of his car.

(2) The officer averred that he thought it was strange when Sims began to sweat and, at the same time, offered the statement that he had been at Wal-Mart to look at a swing set.

(3) Willey asked Sims where he was going, and Sims, who had Illinois tags on his car, said that he had picked up "a friend" named Kimbrough in Mississippi; Kimbrough was a passenger in Sims's car. Sims said that Kimbrough was going to do some yard work for him. However, Kimbrough told Officer Willey a different story — that he (Kimbrough) was traveling with his "brother." Kimbrough could produce only a birth certificate when asked for identification.

(4) Officer Willey also ran a criminal history check on both Sims and Kimbrough, which revealed that both men had prior drug arrests.

(5) Another officer, Beverly Alexander, was present on the scene and wrote up a warning, citing Sims for having a defective brake light.

---

the circumstances. At the end of such period the person detained shall be released without further restraint, or arrested and charged with an offense.

[2] Our criminal rules define a "reasonable suspicion" as "a suspicion based on facts or circumstances which of themselves do not give rise to the probable cause to justify a lawful arrest, but which give rise to more than bare suspicion; that is a suspicion that is reasonable as opposed to an imaginary or purely conjectural suspicion." Ark. R. Crim. P. 2.1. Reasonable suspicion depends on whether, under the totality of the circumstances, the police have specific, particularized, and articulable reasons indicating that the person may be involved in criminal activity. *See Laime v. State*, 347 Ark. 142, 60 S.W.3d 464 (2001).

(6) Officer Willey then returned Sims's identification information to him and let him start walking back to the vehicle, because the "traffic stop was done."

(7) Officer Willey, however, then promptly proceeded to ask Sims if he had anything illegal in his vehicle and Sims said that he did not. Willey asked, "Would you give me consent to search your vehicle?" Sims responded, "I don't have time for you to search." That response raised Willey's suspicions, and Willey decided to hold Sims long enough to run his drug-detection dog around Sims's car. The dog alerted on the car, and, as a result, the officers found and seized cocaine from inside the car.

Based on the facts and circumstances listed above, the trial court in *Sims* reviewed the officers' testimony that they questioned Sims regarding (1) his driver's license and car registration, (2) where Sims was going, and (3) Sims's demeanor during the stop; these facts led Officer Willey to request Sims's consent to a search of his car. The trial court appeared to steer clear of considering whether the circumstances set out gave the officers reasonable suspicion at the conclusion of the valid traffic stop so as to permit them to continue to detain Sims. Instead, the trial court found and held that, where an officer had justification for a stop *or* detention, no justification was needed for a canine sniff. For this reason, the trial court denied Sims's motion to suppress.

On appeal, this court disagreed with the trial court and squarely held that Officer Willey did not have a specific, particularized, and articulable reason indicating that Sims was involved in any drug-related criminal activity.[3] Therefore, the continued detention for the purpose of conducting the dog sniff was unreasonable.

If the reader still has any doubt that the holding in *Sims* does not directly control the present case, that doubt should be fully allayed by reading our most recent case of *Lilley v. State*, 362 Ark. 436, 208 S.W.3d 785 (2005), which is also on all fours with the *Burks* case now before us. In *Lilley*, the issue again was whether the trial court erred in denying the defendant's motion to suppress, and

---

[3] Our court's decision in *Sims* is also consistent with *Illinois v. Caballes*, 543 U.S. 405, 125 S.Ct. 834 (2005), wherein the Supreme Court recently approved the use of a narcotics-detection dog as not violating a driver's Fourth Amendment rights when the sniff was conducted *during* the lawful traffic stop and was not extended beyond the time necessary to complete the criminal history check and issue the warning ticket. (Emphasis added.)

again, this court held that when a traffic stop is over, reasonable suspicion is required to further detain a person and his vehicle in order to conduct a canine sniff. On appeal of the *Lilley* case, this court reversed the trial court's ruling denying James Jesse Lilley's motion to suppress. Our court did so after reviewing the following facts and circumstances:

(1) Officer Mike Bowman was traveling eastbound on Interstate 40 when he observed Lilley drive off the road three times, so he pulled Lilley over. Bowman approached Lilley's car on the passenger side to talk, and Bowman smelled a strong odor of air freshener through the car window. The officer also noticed that Lilley was drinking energy drinks, which were "to keep Lilley awake."

(2) Officer Bowman asked for Lilley's driver's license and vehicle paperwork and, because it was raining, asked him to accompany him to the patrol car. Bowman testified that he was going to issue Lilley a written warning.

(3) Officer Bowman ran the usual checks and talked with Lilley when Lilley volunteered that he was on his way to visit his mother in Chesapeake, Virginia.

(4) Lilley said that he was from California and worked as a farmer, which Bowman said "struck him as odd."

(5) Bowman found a *one-way car rental agreement* from California to Virginia, despite the fact that Lilley said he planned to return to California. The agreement showed the vehicle had been rented to a William Haller, who was not present. The agreement reflected Lilley as an additional driver. Lilley said that he planned to *drive back to California* after a ten-day vacation; he further explained that Haller had rented the vehicle for him because Lilley had no credit card.

(6) After Officer Bowman completed writing Lilley's warning citation, Bowman handed everything back to Lilley. At that point, Bowman asked Lilley if he had anything illegal in the vehicle. Bowman said that he asked because of (1) his earlier detection of the fragrance of air freshener, (2) the car renter, Haller, was not in the vehicle, (3) the one-way travel agreement, and (4) Lilley's nervousness got worse. Bowman also asked Lilley if he had any guns or dead bodies in the car, to which Lilley said, "No," while keeping eye contact with Bowman. When asked if he had any marijuana in his car, Lilley looked away and said in a softer

tone, "No." Lilley looked back up when Bowman asked if he had cocaine or "meth" in the car, and he said, "No."

(7) Officer Bowman then asked Lilley if he would consent to search his vehicle, and Lilley refused. Bowman had a "drug dog" in the back seat of the patrol car, and conducted a canine sniff. The dog alerted to Lilley's trunk, where Bowman found and seized three duffel bags of marijuana.

Our court rejected the State's submission of the foregoing facts as valid factors or reasons for giving Officer Bowman reasonable suspicion to detain Lilley further after Bowman concluded the investigation of Lilley's traffic offense by issuing a warning citation. This court reasoned in *Lilley* that nervousness alone does not constitute reasonable suspicion of criminal activity. *See Laime v. State*, 347 Ark. 142, 155, 60 S.W.3d 464, 473 (2001). Our court also concluded that there was nothing inherently suspicious about using a car rented by a third party, even when combined with the nervousness of the suspect. *See United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998). Our court further saw nothing inherently suspicious in the rental agreement's being for a one-way trip, especially since Lilley explained that he was going to Virginia to visit his mother, but intended to return to California at a later date. And, as for the strong scent of air freshener from the car, this court stated that the scent might also be considered an innocent act (although one that, when found in conjunction with other factors, could constitute reasonable suspicion). *See United States v. Foley*, 206 F.3d 802 (8th Cir. 2000). In sum, the *Lilley* court held that "it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." *See United States v. Beck*, 140 F.3d at 1137.

This case now before our court has striking similarities to the facts in both *Sims* and *Lilley*. Here, after Crawford County Deputy Sheriff Matthew LaMora stopped James Burks for failing to merge left before a construction zone on Interstate 40, LaMora asked Burks for his driver's license and car registration. Burks told LaMora that the car was a rental and gave the officer the rental agreement. LaMora found Burks was not under the influence of any controlled substance. LaMora then asked where Burks was heading; Burks replied he was going "out east." LaMora noticed the "return" date on the rental agreement was April 24, 2002, the day before the traffic offense. When asked again his destination, Burks said that he was going to New York. Though LaMora

testified that he found this answer to be suspicious and inconsistent with Burks's previous statement the he was going "east," New York, is, indeed, east of Arkansas.

Officer LaMora testified at the suppression hearing that he became suspicious because Burks was driving a rental car that appeared to be due on April 24, 2002, and Burks was driving outside the geographical limits reflected in the rental agreement. The State urged at oral argument that this was an indication that Burks could have been stealing the car, which would be a felony or misdemeanor involving forcible injury to persons or property. This argument is specious. First, the rental agreement bears Burks's address, driver's license, and other identification from which any officer or rental company could use to find or locate Burks; Burks's behavior in willfully providing this information to LaMora certainly seems inconsistent with the behavior of a car thief. Second, the rental agreement also reflects an apparent scrivener's error by the company, in that it shows Burks rented the car on April 23, 2004, and paid in full for one week, making the car due on April 30, 2004, well after the April 24, 2004, due date used by Officer LaMora. Third, even if Burks violated the rental agreement, that fact shows only that he breached the terms of the parties' contract, not that he was committing a felony. Clearly, one phone call to the rental company could have resolved any questions regarding the car.

In the present case, even though the stop of Burk's car was lawful at its inception, it nevertheless became unlawful because its manner of execution unreasonably infringed on Burk's right to be on his way, once the purpose of the stop was over. *See Caballes*, 125 S.Ct. at 837. The seizure in this case was justified by the State's interest in issuing a warning ticket; however, it became unlawful because "it [was] prolonged beyond the time reasonably required to complete that mission." *Id.* Once the purpose of the traffic stop was over, LaMora had no specific, particularized, and articulable facts on which to base a reasonable suspicion that Burks was committing a felony or violent misdemeanor. As such, the use of the drug dog to sniff Burk's vehicle violated Rule 3.1, and the trial court erred in denying Burks's motion to suppress. In sum, this case represents a glaring departure from this court's very recent case law; it simply cannot be reconciled, and it is wrong. This court should either follow *Sims* and *Lilley*, or overturn them.

HANNAH, C.J., and IMBER, J., join this dissent.