Jimmy BUMGARDNER *v.* STATE of Arkansas

CA CR 05-775

253 S.W.3d 1

Court of Appeals of Arkansas
Opinion delivered March 14, 2007

*Craig Lambert*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Clayton K. Hodges*, Ass't Att'y Gen., for appellee.

LARRY D. VAUGHT, Judge. Appellant Jimmy Bumgardner was charged by felony information with possession with intent to deliver methamphetamine and possession of drug paraphernalia. He entered a conditional-guilty plea and was sentenced to ten years' imprisonment. On appeal Jimmy argues that the trial court erred in its denial of his motion to suppress. We agree and reverse his conviction.

According to the testimony presented during the suppression hearing, this case began on April 20, 2004, when Officer Daniel Creasey approached the home occupied by Jimmy and his wife, Michelle Bumgardner. Michelle was standing on the porch of the home with a baseball bat in hand. She was shouting obscenities at her husband and instructing him to vacate the property. Jimmy asked Creasey for permission to leave the premises, but Creasey refused the request, explaining that he was investigating "this crime in progress" and that if he made "any determination that [Jimmy had] not done anything wrong, then [he] could leave." Creasey then called for "backup," and followed Michelle into the home but stayed at the front door of the home "so he could watch [Michelle] and watch [Jimmy] at the same time and keep them split up until [his] backup unit could arrive." Creasey explained that he always called for backup in situations involving domestic violence because "you don't never want to go by yourself, it's a dangerous call and anything can happen."

Officer Daniel Richey responded to the call and was asked to "stay with [Jimmy] on the front porch." At the hearing Richey testified that once he arrived at the scene he remained "within about five feet" of Jimmy so that he could "keep an eye on both of them." Creasey then conducted an interview of Michelle, where he learned that she and Jimmy had been involved in a disturbance the previous evening, and this was a continuation of their earlier dispute. Creasey stated that he warned Michelle that he "could have possibly charged her with domestic assault." After this admonition, Creasey noted that Michelle calmed down and ex-

plained that she was angry because she believed that Jimmy had her keys and would not give them back.

At the suppression hearing Creasey conceded that at this point in his investigation he had determined that no charges would be filed, and neither party would be arrested. Indeed, Creasey stated that he looked at Jimmy "as the victim." However, Creasey decided to remain at the scene "in the spirit of community policing" and help Michelle recover her missing keys. He approached Jimmy and asked if he had Michelle's keys; Jimmy stated that the only keys he had were his own. Richey then inquired if Jimmy would allow the officers to conduct a pat-down search. Jimmy agreed, but no keys — other than his own — were found. The officers then conducted a fruitless search of the couple's front yard in an attempt to locate the missing keys. At this time, approximately twenty minutes had elapsed since the officers' initial arrival at the scene.

Next, Creasey approached Jimmy, who remained under Richey's watch, and asked for permission to search his vehicle. According to Creasey, Jimmy stated that his truck was locked, then handed Creasey the keys and said, "sure, go ahead." While Creasey was conducting the search of Jimmy's truck, officer Richey remained with Jimmy. Although Creasey failed to locate the "missing keys" during his extensive search of Jimmy's truck, he did find various items used in the manufacture of methamphetamine. Following Creasey's discovery, Jimmy was placed under arrest.

After his arrest, Jimmy filed a motion to suppress the evidence recovered from his truck because his consent was invalid. Specifically, he argued that he was unlawfully detained in violation of Ark. R. Crim. P. 3.1 and the Fourth Amendment. The State responded that Jimmy was free to leave once Creasey determined that no crime had been committed and that because Creasey chose to remain in the front yard and to cooperate with the officers, his consent was voluntary. The trial court denied the motion, and Jimmy entered a conditional-guilty plea pursuant to Ark. R. Crim. P. 24.3(b).

In reviewing the trial court's denial of a motion to suppress evidence, we conduct a de novo review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by

the trial court. *Sims v. State*, 356 Ark. 507, 157 S.W.3d 530 (2004). We begin our review with an examination of Ark. R. Crim. P. 3.1, which permits a detention without arrest under certain circumstances:

> A law enforcement officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit (1) a felony, or (2) a misdemeanor involving danger of forcible injury to persons or of appropriation of or damage to property, if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct. An officer acting under this rule may require the person to remain in or near such place in the officer's presence for a period of not more than fifteen (15) minutes or for such time as is reasonable under the circumstances. At the end of such period the person detained shall be released without further restraint, or arrested and charged with an offense.

Based on the language contained in Rule 3.1, we are satisfied that Creasey's initial stop at the Bumgardner home and his preliminary investigation were legitimate functions of his duty as a law-enforcement officer. An officer patrolling a neighborhood who observes any angry exchange, especially one involving a weapon, between two parties certainly has a right to stop and make inquiries. Further, we are not troubled by the fact that Creasey did not permit Jimmy to immediately leave the scene. It was prudent for Creasey to ask Jimmy to remain at the scene until a proper investigation of the high-tempered exchange could be completed.

■ It is what happened after Creasey determined that Jimmy had committed no crime and was the "victim" that is troubling to us. After Creasey made this determination, the continued detention of Jimmy — under Richey's watchful eye — constituted a seizure within the purview of the Fourth Amendment. We are not convinced, as the State argues, that Jimmy should have known that he was free to leave once Creasey had spoken with Michelle and determined that she was not injured or being threatened. Jimmy specifically requested permission to leave the scene and was told that he must remain until the investigation was completed. He was never told that he was free to go or that the investigation had been completed. To the contrary, for twenty minutes Jimmy remained under Richey's care while the officers

were actively engaged in a "missing keys" investigation. Jimmy was asked to submit to a pat-down search, asked to produce the keys he had been accused of stealing or throwing in the yard, and asked to submit to a search of his vehicle.

The State would have us require Jimmy to determine the moment the officers' investigation of domestic abuse (which justified his detention) ended and their altruistic key-locating assistance (which did not justify his detention) began. This would require far more of Jimmy than is reasonable or — in this case — possible. After the officers determined that Jimmy was not a suspect, but a victim, the officers conceded that they had no reasonable suspicion to continue his detainment. However, Jimmy was not told that he was free to leave and had no indication that his right to mobility had been restored.

■ Because he was illegally seized at the time he submitted to a search of his vehicle, we conclude that Jimmy's consent was not an act of free will of sufficient force to purge the primary taint. *See Stone v. State*, 348 Ark. 661, 74 S.W.3d 591 (2002). Accordingly, we reverse and remand this case with instructions that the evidence seized from Jimmy's truck must be suppressed because it is "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

Reversed and remanded.

HEFFLEY and MILLER, JJ., agree.