Cite as 2025 Ark. App. 210

# ARKANSAS COURT OF APPEALS
## DIVISION III
### No. CR-24-438

| | | |
|---|---|---|
| | | **Opinion Delivered** April 9, 2025 |
| BRANDI GUTHARY | APPELLANT | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72CR-20-918] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE JOANNA TAYLOR, JUDGE |
| | APPELLEE | AFFIRMED |

## STEPHANIE POTTER BARRETT, Judge

Appellant Brandi Guthary was convicted by a Washington County Circuit Court jury of possession of methamphetamine with intent to deliver and possession of drug paraphernalia; she was sentenced to a total of nine years' incarceration. These items were discovered after Guthary was stopped for a traffic violation; the officer called for a drug dog, the dog alerted on her vehicle, and the subsequent search revealed approximately fifty grams of methamphetamine and drug paraphernalia. Guthary filed a motion to suppress, which was denied at a pretrial hearing. Guthary makes two arguments on appeal: (1) the circuit court erred in denying her motion to suppress the evidence because she was unlawfully detained when the officers completed the traffic stop and extended the stop without probable cause; and (2) she was subjected to improper custodial interrogation when she was unlawfully questioned without being informed of her *Miranda* rights. We affirm.

The following facts were ascertained at the suppression hearing. At approximately 8:00 a.m. on April 3, 2020, Tontitown police officer Chris Porter was on patrol when he was dispatched to the intersection of Highway 112 and Highway 412 on the basis of an anonymous tip that a black Dodge truck was driving in the opposing lane of traffic. Officer Porter located the vehicle in the Casey's parking lot at the fuel pumps and verified the license plate. He noticed that the male passenger appeared to be pumping gas, and the female driver went inside the store. Officer Porter pulled across Highway 112 into a parking lot to observe the vehicle; the driver came out of the store, and she and her passenger got into the truck and left. Officer Porter followed the truck, which traveled into the McDonald's parking lot located next to Casey's; he initially believed the driver was going to pull into the drive-thru, but the vehicle exited the back of the parking lot onto a side street used for deliveries to the businesses located in that area. Although he did not activate his lights at that point, Officer Porter continued to follow the vehicle, which traveled back to Highway 412 and turned right; Officer Porter observed that the driver did not use a turn signal, made a wide turn into both lanes, and crossed the center line again. At that point, Officer Porter activated his lights, but the vehicle did not immediately stop—it passed a side road and numerous parking lots. The vehicle eventually stopped in the middle of Founder's Park Road, which is located in Springdale, instead of pulling into any of the nearby parking lots.

Officer Porter made contact with the occupants of the truck; Guthary was the driver, and her nephew, Kyle Lawson, was the passenger. Both parties appeared nervous: Guthary was visibly shaking, and Lawson avoided eye contact with him. From his experience, he

2

considered their behavior unusual. Guthary told Officer Porter she was tired because she had been up all night moving. Guthary gave Officer Porter her driver's license; when he ran it, he learned Guthary had a suspended driver's license as well as a criminal history, including drug use. Officer Porter, who had twenty-four years' experience in law enforcement, testified that, given Guthary's avoidant behavior leaving Casey's, Guthary's statement to him that she did not get gas, even though he saw her vehicle at the fuel pumps at Casey's, and their nervous behavior after being stopped, he suspected there was probably something illegal in the vehicle, and he called for a K9 unit. He first called the Tontitown chief of police, but he was unavailable, so he requested dispatch to contact Springdale to see if they had a K9 available. A Springdale officer arrived approximately seven minutes after he requested assistance.

While he was waiting for the Springdale K9 to arrive, Officer Porter wrote Guthary a citation for driving on a suspended license; he then returned to the truck and had Guthary and Lawson exit the vehicle. He did not give Guthary the citation at that time. He explained that he wrote Guthary a citation for driving on a suspended license rather than arresting her because COVID-19 was rampant, and the jail was not taking anyone other than violent felony offenders in an attempt to prevent the spread of the virus in the jail. Given that restriction, it was never his intention to arrest Guthary because he had no place to take her. Officer Porter explained that he did not give Guthary the citation after he printed it because in his experience, it ruled out any claim of partiality if he asked for consent to search a vehicle

3

and it was refused; he already had the ticket written out, and the answer to a request for consent had no bearing on whether he wrote a ticket.

When asked why he had Guthary and Lawson exit the vehicle, Officer Porter explained that he knew the K9 was on its way, and he did not want them in the vehicle during the search for safety purposes. Officer Porter testified that neither Guthary nor Lawson were under arrest, handcuffed, or placed in his patrol vehicle at that time but that Guthary was not allowed to drive away because her license was suspended, and he was prepared to have a wrecker tow the vehicle if necessary. Officer Porter instructed Guthary and Lawson to stand in front of his vehicle, which had its lights activated, when he asked them to get out of the truck because it was the safest place for them to be.

Officer Porter testified that Officer David Reed from the Springdale Police Department arrived with his K9, Rizo; before Officer Reed deployed Rizo, Officer Porter asked both Guthary and Lawson several times if there were any syringes in the vehicle, as he had been stuck during a previous search of a vehicle. Guthary told him she did not think there were any needles in the vehicle, but if there were, they would be in a black bag. Also before the search, under questioning by Officer Porter, Guthary admitted there might be a marijuana "roach" in the ashtray.

Rizo performed a free-air sniff, and Officer Reed notified Officer Porter that Rizo had alerted to the odor of narcotics in the vehicle. A search was performed; the officers found small plastic baggies in Guthary's purse that were consistent with packaging for drug sales; they also located marijuana in a backpack on the passenger side floorboard, and in a black

4

bag behind the driver's seat, they found syringes and fifteen bags of methamphetamine totaling over fifty grams. Officer Porter reiterated that he never arrested or handcuffed Guthary or Lawson nor did he place them in the back of his patrol car because the jail would not take them; instead, he called the jail for a felony cite, he was given a court date and issued the felony citation, and he gave Guthary both the felony citation and her citation for driving on a suspended license at the same time. Officer Porter seized Guthary's license, and he told Guthary to pull in the bank parking lot because neither she nor Lawson had a valid license; however, she drove off, and he did not attempt to stop her.

On cross-examination, Officer Porter admitted he did not attempt to stop Guthary after she drove through the McDonald's parking lot; he activated his lights only after he saw Guthary cross the center line two times. He admitted that Guthary had some moving supplies in her vehicle and that her statement that she had been moving all night and was tired was possibly true. He said there were no illegal items in plain sight when he stopped Guthary. He admitted that he learned a couple of minutes after returning to his patrol car that Guthary was driving on a suspended license and that she had a criminal history, although her last drug-related arrest was ten years old.

Officer Porter admitted he had told the first officer he contacted that he was going to search before he even knew if a K9 was available; he clarified that he would search if the dog alerted. He believed that there was no reason for the evasive driving through McDonald's except to avoid him, although he admitted that someone being tired was not inherently suspicious. Officer Porter admitted that once he had written the citation for driving on a

5

suspended license, that part of the investigation—for traffic infractions—was completed, but he asked Guthary to exit her vehicle about twelve minutes into the stop, asked her if there were any syringes in the vehicle, told her to stand in front of his patrol car, and informed her that a K9 was coming to search her vehicle. When asked if he remembered Guthary specifically asking why she was being searched, he said that he assumed it would be obvious. He agreed that the K9 arrived about seventeen minutes into the stop. In body-cam video, Officer Porter can be heard telling Officer Reed that Guthary was "wishy washy" on consent and whether there were syringes in the vehicle, and while he "kind of believed" she was tired from moving, she and Lawson both had a criminal history, Guthary was trying to evade him, and she had admitted right before Officer Reed arrived that there might be a "roach" in the ashtray.

Officer Porter admitted that after Rizo indicated a positive hit and Officer Reed gave him the okay to search, he questioned Guthary for an additional eight minutes before searching her vehicle; he explained that he was questioning Guthary about syringes, and he admitted that he told her he would charge her with felony battery on a law enforcement officer if he was stuck with a needle while performing the search. He agreed that he did not Mirandize Guthary before questioning her and that she was detained for the purpose of a traffic stop, but he opined that he could not have stopped her from leaving had she wanted to. When questioned about whether he remembered Guthary asking to go to the bathroom, he said yes and that he told her she could go to the bathroom, but most businesses were not open due to the COVID-19 pandemic; he also remembered that Guthary had asked to put

6

her dentures in, but he told her that she could not do that because the K9 had arrived at that point. He agreed that the search of Guthary's vehicle began a little over thirty minutes into the stop.

Officer David Reed of the Springdale Police Department testified that his K9, Rizo, was trained to alert to the presence of the odor of narcotics—methamphetamine, heroin, cocaine, and marijuana. He said that on April 3, 2020, he was dispatched to assist the Tontitown Police Department with a traffic stop between 8:00 and 8:10 a.m.; when he arrived, he made contact with Officer Porter and asked him what gave him probable cause to extend the stop past fifteen minutes to be able to run Rizo. He said Officer Porter provided a satisfactory explanation, and he conducted a free-air sniff with Rizo. He said that before the free-air sniff, he was not aware that Guthary had admitted to anything being inside the vehicle. Officer Reed said that Rizo alerted on the vehicle, and he assisted Officer Porter in the search. They found several packages of methamphetamine totaling approximately fifty grams behind the driver's seat. Officer Reed did not see Guthary in handcuffs or in the back of a patrol car.

On cross-examination, when asked whether he questioned Guthary concerning contraband that might be in the vehicle to save time and keep the officers from being injured, he said that he probably did. He also agreed that two minutes later, he asked again if there was anything in the vehicle that he needed to know about and that he probably continued to ask Guthary the same question. Officer Reed did not remember Guthary telling the officers that she needed to use the bathroom, but he testified that he would not be surprised

7

at that request; he said people often tried to separate themselves from the vehicle, and the need for a bathroom was a common reason that was given. Officer Reed agreed that he never Mirandized Guthary.

In denying Guthary's motion to suppress, the circuit court found that Officer Porter was investigating a report of reckless driving when he instigated the traffic stop. After the stop, he ran Guthary's license and determined that it was suspended and that both Guthary and Lawson had an "extensive" drug history; he then called for a K9 to perform an open-air sniff. The circuit court recounted that Officer Porter asked Guthary and Lawson to step out of the vehicle, which they did; it was the circuit court's estimation that thirteen minutes had elapsed between the initial stop and when Guthary and Lawson were asked to exit the vehicle. The circuit court further noted that Officer Porter testified that he had written the citation before he asked Guthary and Lawson to exit the vehicle, but he did not give Guthary the citation at that time. After Guthary and Lawson were out of the vehicle, Officer Porter asked if there was anything illegal inside the vehicle, and Guthary stated that there might be a marijuana butt in the ashtray; that statement was almost simultaneous with the K9's arrival.

The circuit court determined that Officer Porter was investigating Guthary's reckless driving. The circuit court noted that Guthary had stopped in the middle of the road, which Officer Porter found peculiar, and it found that Officer Porter's continued investigation was based on the information he obtained when he ran Guthary's license—that she had a suspended license and an extensive drug history. The circuit court found that before Officer Porter concluded the stop and decided to cite Guthary only for driving on a suspended

8

license, he asked her if there was anything illegal in the vehicle, to which Guthary responded that there might be a marijuana butt in the ashtray. In conclusion, the circuit court found that Officer Porter had probable cause to stop the vehicle and that he developed probable cause to search the vehicle on the basis of Guthary's spontaneous statement that there might be a marijuana butt in the ashtray. The circuit court found that the reason for the initial stop had not expired and was not completed when Guthary made the spontaneous statement, and the length of the stop was not unreasonable. The circuit court further found that when Guthary was asked to step out of her vehicle and move to the front of Officer Porter's patrol car, the officer's question concerning anything illegal in the vehicle was for the officers' safety; while Guthary said there might be a marijuana butt in the ashtray, that answer was spontaneous and not the result of interrogation by the police, and Guthary did not have to be Mirandized in order for Officer Porter to ask questions for officer-safety purposes.

Guthary first argues that the circuit court erred in denying her motion to suppress. When reviewing a circuit court's denial of a motion to suppress evidence, we conduct a de novo review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to the inferences drawn by the circuit court. *Cagle v. State*, 2019 Ark. App. 69, 571 S.W.3d 47. A finding is clearly erroneous when, even if there is evidence to support it, the appellate court, after reviewing the entire evidence, is left with the definite and firm conviction that a mistake has been made. *Id.* We defer to the circuit

court's superior position in determining the credibility of the witnesses and resolving any conflicts in the testimony. *Id.*

Guthary argues on appeal that she was unlawfully detained after Officer Porter had completed the traffic stop and had no probable cause to extend the stop but continued to detain her. Rule 3.1 of the Arkansas Rules of Criminal Procedure provides

> A law enforcement officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit (1) a felony, or (2) a misdemeanor involving danger of forcible injury to persons or of appropriation of or damage to property, if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct. An officer acting under this rule may require the person to remain in or near such place in the officer's presence for a period of not more than fifteen (15) minutes or for such time as is reasonable under the circumstances. At the end of such period the person detained shall be released without further restraint, or arrested and charged with an offense.

In *Rodriguez v. United States*, 575 U.S. 348 (2015), the United States Supreme Court—while acknowledging its holding in *Illinois v. Caballes*, 543 U.S. 405 (2005), that a dog sniff conducted during a lawful traffic stop does not violate a person's right to be free from unreasonable seizures—held that the police may not extend an otherwise-completed traffic stop, without reasonable suspicion, in order to conduct a dog sniff of the vehicle. The Supreme Court further held that while an officer's safety interest is part of the mission of the traffic stop, on-scene investigation into other crimes "detours from that mission," 575 U.S. at 356, and "a dog sniff is not fairly characterized as part of the officer's traffic mission." *Id.* However, because the Eighth Circuit did not review the magistrate's determination that the dog sniff was not independently supported by individualized suspicion, the *Rodriguez*

10

Court vacated the judgment and remanded the case to the Eighth Circuit for further proceedings consistent with its opinion.

Arkansas case law follows the logic of *Rodriguez*. In *Sims v. State*, 356 Ark. 507, 157 S.W.3d 530 (2004), our supreme court held that a law enforcement officer, as part of a valid traffic stop, may detain a traffic offender while completing certain routine tasks, such as computerized checks of the vehicle's registration and the driver's license and criminal history, as well as writing a citation or warning; the officer may also ask routine questions, ask if he may search the vehicle, and act on any information that is volunteered; however, after these routine tasks are completed, continued detention of the driver may become unreasonable unless the officer has a reasonably articulable suspicion that criminal activity is occurring or about to occur.

"Reasonable suspicion" is defined as

[a] suspicion based on facts or circumstances which of themselves do not give rise to the probable cause requisite to justify a lawful arrest, but which give rise to more than a bare suspicion; that is, a suspicion that is reasonable as opposed to an imaginary or purely conjectural suspicion.

Ark. R. Crim. P. 2.1.

According to Arkansas Code Annotated section 16-81-203 (Repl. 2005), some of the factors to be considered in determining if an officer has grounds to reasonably suspect include:

(1) The demeanor of the suspect;

(2) The gait and manner of the suspect;

(3) Any knowledge the officer may have of the suspect's background or character;

(4) Whether the suspect is carrying anything, and what he or she is carrying;

(5) The manner in which the suspect is dressed, including bulges in clothing, when considered in light of all of the other factors;

(6) The time of day or night the suspect is observed;

(7) Any overheard conversation of the suspect;

(8) The particular streets and areas involved;

(9) Any information received from third persons, whether they are known or unknown;

(10) Whether the suspect is consorting with others whose conduct is reasonably suspect;

(11) The suspect's proximity to known criminal conduct;

(12) The incidence of crime in the immediate neighborhood;

(13) The suspect's apparent effort to conceal an article; and

(14) The apparent effort of the suspect to avoid identification or confrontation by a law enforcement officer.

We hold that Officer Porter developed reasonable suspicion to continue to detain Guthary and Lawson after he had written the ticket for driving on a suspended license. Guthary attempted to evade Officer Porter when leaving the Casey's parking lot by driving through the McDonald's parking lot and taking a circuitous route back to the highway instead of driving straight out of the Casey's parking lot. Officer Porter saw Guthary cross the center line, and he activated his lights; however, Guthary did not immediately pull over on the side of the road or into one of the numerous parking lots she passed; instead, she

12

drove past several side roads before turning on one and then stopping in the middle of the road. This court had the opportunity, as the circuit court did, to view Officer Porter's body-cam video, which showed Guthary's and Lawson's demeanor and appearance after they were stopped. While mere nervousness cannot constitute reasonable grounds for detention, *Enriquez v. State*, 97 Ark. App. 62, 244 S.W.3d 696 (2006), the video showed that Guthary was anxious and tense, and she lied to Officer Porter about getting gas, even though he had seen her vehicle stopped at the gas pumps immediately before he stopped her. Furthermore, Lawson refused to make eye contact with Officer Porter and stared off into the distance instead. After performing a record check, Officer Porter learned that Guthary was driving on a suspended license, and both Guthary and Lawson had criminal histories, including drug charges; he then immediately called for a K9 to perform a search. Under these circumstances and the deference given to the circuit court's inferences and credibility determinations, we cannot say that the denial of Guthary's motion to suppress is clearly erroneous.

Guthary also argues that she was unlawfully questioned when she was repeatedly asked incriminating questions without being given the warnings prescribed by *Miranda v. Arizona*, 384 U.S. 436 (1966). In *Mannatt v. State*, 311 Ark. 17, 26, 842 S.W.2d 845, 852 (1992), our supreme court discussed the applicability of *Miranda* warnings to traffic stops, holding that

> [i]n *Berkemer v. [McCarty]*, 468 U.S .420 (1984), the United States Supreme Court held that persons temporarily detained pursuant to a routine traffic stop are not "in custody" for purposes of *Miranda*. The Court reasoned that *Miranda* warnings were

13

not required in such cases because the stop was temporary, it was public, and the atmosphere on a public street is not comparable to the "police dominated" custodial interrogation. The Court held that a motorist who is detained pursuant to a traffic stop is entitled to recitation of his rights only when the stop becomes such that he is "subjected to treatment that renders him 'in custody' for practical purposes."

In *Marcyniuk v. State*, 2010 Ark. 257, 373 S.W.3d 243, our supreme court held that being questioned in an officer's patrol car during a routine traffic stop did not rise to the level of a custodial interrogation so as to require *Miranda* warnings because Marcyniuk was not restrained in any way while sitting in the officer's car, and the officer's actions and questioning before appellant was Mirandized did not rise to that of a formal arrest.

Applying the *Berkemer* rationale, Guthary was not entitled to *Miranda* warnings during a routine traffic stop. The circumstances of Guthary's interaction with the police did not render her in custody. The circumstances surrounding Guthary's stop were even less likely to trigger the requisite *Miranda* warnings than those found in *Marcyniuk*—she was never handcuffed, arrested, or placed in a patrol car for questioning. We affirm on this point.

Affirmed.

ABRAMSON and VIRDEN, JJ., agree.

*Lisa-Marie Norris*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Christian Harris*, Ass't Att'y Gen., for appellee.