# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
May 12, 2009 Session

## STATE OF TENNESSEE v. MELVIN JEROME REED, JR.

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2007-B-1696     Steve R. Dozier, Judge**

_____

**No. M2008-01850-CCA-R3-CD - Filed September 17, 2009**

_____

The defendant, Melvin Jerome Reed, Jr., pled guilty to possession of 300 grams or more of a Schedule I controlled substance with intent to sell or deliver, a Class A felony, in exchange for a Range I sentence of twenty years, to be served consecutively to two other sentences. As a condition of his guilty plea, the defendant reserved three certified questions of law pursuant to Rule 37(b)(2)(A) of the Tennessee Rules of Criminal Procedure regarding the legality of the traffic stop, detention, and search of his vehicle on March 16, 2007. We conclude that the questions are properly certified and that the trial court ruled correctly in denying the motion to suppress.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Richard L. Holcomb, Knoxville, Tennessee (on appeal); and Jim Todd and Dumaka Shabazz, Nashville, Tennessee (at trial), for the appellant, Melvin Jerome Reed, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Melissa Roberge, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Amy H. Eisenbeck and Jennifer McMillen, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

Following the defendant's indictment for possession of 300 grams or more of a Schedule I controlled substance with intent to sell or deliver, he filed a motion to suppress, arguing that the stop, detention, and K-9 sweep of his car violated his constitutional rights.

**State's Proof**

At the February 28, 2008, suppression hearing, Officer Melissa Schultz with the Metropolitan Nashville Police Department testified that on March 16, 2007, she was working routine patrol on the midnight shift. As she was leaving Dellway Villa Apartments after assisting an officer on another call, Officer Schultz noticed the defendant sitting in his vehicle in the parking lot. She only noticed the defendant because the parking lot was dark except for his vehicle, which had its lights on and appeared to be leaving. Officer Schultz left the apartment complex and was traveling on Dickerson Road when she spotted the defendant's car ahead of her. She acknowledged that she intentionally followed the defendant and may have exceeded the speed limit in an attempt to catch up with him to "run tags . . . and do [her] job pro-actively." Asked if there was a police policy requiring that she activate her blue lights when traveling more than ten miles an hour over the posted speed, Officer Schultz said, "When you are responding to emergency calls, there is. I was not responding to an emergency call; so, therefore, no."

Officer Schultz testified that when the defendant reached the intersection with Trinity Lane, he slowed down but did not come to a complete stop before making a right-hand turn. At that point, Officer Schultz activated her emergency equipment and initiated a traffic stop of the defendant's vehicle. The defendant pulled over immediately, and Officer Schultz approached his car, informed him of the reason he was stopped, and asked for his license, registration, and insurance information. The offense report listed the time of the incident as 2:25 a.m. Asked if anything happened during her encounter with the defendant that provided her with reasonable suspicion or probable cause that the defendant was committing or had committed a crime, Officer Schultz stated that "in nine years of experience in dealing with people and learning body language . . . and learning reactions . . . I felt that he was a little bit nervous[,]" but acknowledged that did not give her reasonable suspicion.

Upon returning to her patrol car, Officer Schultz radioed for a K-9 unit to come to the scene, ran "the normal checks, validity of the license, outstanding warrants, . . . arrest history, criminal history, NCIC checks" and started to write out a ticket at 2:33 a.m. according to the clock in her patrol car. Officer Schultz acknowledged that the only check required by law is to check for outstanding warrants but explained that "[she] like[d] to go beyond the traffic stop" and not "do just what is required." She stated that she had never timed how long it takes her to write out a ticket because, while doing so, she pulled up information on the computer and received information from other officers. She said that these were not stalling tactics. Officer Schultz noted that the computer checks take longer when the person has an alias.

Officer Schultz testified that she did not believe that she asked the defendant for consent to search his car before she called for the K-9 unit. She stated that she may have noted in her report how long it took the K-9 unit to arrive, but it did not seem like an unusual amount of time. She estimated that the units normally take anywhere from eight to twenty minutes to respond depending on traffic. The K-9 unit arrived "before [she] was finished doing what [she] needed to do on [her] end." After looking at her report, Officer Schultz noted that the K-9 unit arrived on the scene approximately six to eight minutes after being dispatched.

Officer Schultz testified that once the K-9 unit arrived, she informed the officer that the defendant had been stopped for running a red light and asked the officer "to run the dog around the car[.]" She also had the defendant step out of his vehicle away from the car "so as to not . . . have any accidents with the dog or anything like that[.]" The dog gave a positive indication on the vehicle, and a probable-cause search revealed "nineteen individual bags of what was believed to be Ecstasy at the time, total of eighteen-hundred-and-fifty pills." She elaborated that the K-9 officer performed a cursory search of the car first and did not find anything, then she searched and uncovered the drugs. Officer Schultz explained that she always double-checked the cars she stopped.

Officer Schultz testified that the arrest report indicated that it was written at 2:30 a.m., but it was actually written after the ticket. She explained that she had utilized "several different clocks" during the encounter, including her watch, the clock on her patrol car, the clock on the computer, and the clock on her cell phone. She said that the defendant's name was listed as Melvin Reed with the alias of Melvin Harding on the arrest report.

Officer Mark Sydenstricker with the Metropolitan Nashville Police Department K-9 Section testified that he received the call from the dispatcher at 2:31 a.m. and arrived on the scene at 2:43 a.m. He conducted the K-9 sniff at 2:48 a.m. Officer Sydenstricker testified that he did not recall whether he personally searched the vehicle after the dog indicated or whether Officer Schultz was the only one to search.

**Defendant's Proof**

The defendant testified that Officer Schultz activated the blue lights on her patrol car "way before [he] even got to the light . . .[,] [r]ight when [he] got in the turning lane." He went ahead and made the right turn, then pulled over. Officer Schultz requested his license, registration, and insurance card and asked if he was drunk. The defendant recalled that he told Officer Schultz to give him a breathalyzer test because he did not drink "and then she tried to say that [he] ran a red light." Officer Schultz returned to her patrol car, while the defendant waited in his car. He did not know how long it took the K-9 unit to arrive, but he smoked two to three cigarettes as he waited.

On cross-examination, the defendant testified that his real name is Melvin Harding, but he had gone by Melvin Reed for twenty-five or twenty-six years. He admitted that he was on probation for a drug offense when he was stopped in this case. He also acknowledged that he had another felony conviction for possession of cocaine for resale.

Bobby Brown, a private investigator and paralegal, testified that he reviewed Automatic Vehicle Locator ("AVL") documents at the defendant's request. According to the records, there was a call from car 237 at 2:25 a.m. At that time, the report showed an initial speed of zero-miles-per-hour, but during that same minute, the report indicated a speed of sixty-miles-per-hour. Brown attempted to map the latitude and longitude taken from the AVL for both of the speeds on Google Earth; however, the court disallowed such testimony because Brown could not testify to the accuracy of the information on Google Earth.

Richard Vaughn, Director of Information Technology for the Metropolitan Nashville Police Department, testified that all of the metro patrol vehicles are equipped with an AVL that transmits data to a central location controlled by the Emergency Communications Center. The AVL for car 237 showed that it arrived at the corner of Trinity Lane and Dickerson Pike at 2:27 a.m. The AVL showed that the car was at the 2700 block of Dickerson Pike and not moving at 2:25 a.m., and was at the 2300 block of Dickerson Pike at 2:27 a.m. and traveling sixty-miles-per-hour. Still during the 2:27 minute, the car slowed to twenty-two-miles-per-hour and was at the 2200 block of Dickerson Pike. The car finally stopped at the 100 block of Trinity Lane, still during the 2:27 minute. Car 237 started to move again around 3:38 a.m.

Vaughn testified that the audit trail of the computer record checks showed that at 2:31 a.m., Officer Schultz received information from a local warrant check, a driver's license query, and two warrant searches through NCIC. Officer Schultz requested an arrest check at 2:31 and a juvenile criminal history check at 2:33 a.m., and both results were returned immediately. Officer Schultz did not make another inquiry until 4:19 a.m.

On cross-examination, Vaughn testified that although the reports were returned at the same time, it was not likely an officer would have the various reports open at the same time. Vaughn said that the time reflected on the AVL runs off a different clock than the time reflected on the computer records, and the times were not necessarily synchronized.

In denying the defendant's motion to suppress, the trial court accredited Officer Schultz's testimony and found that she "validly stopped the defendant for running through a traffic control signal." The court noted that Officer Schultz "almost immediately" called for a K-9 unit and then pursued her investigation to determine the defendant's identity and legal status for citation. The court observed that Officer Schultz conducted her last computer inquiry at 2:33 a.m. and began writing the ticket at 2:33 a.m., but noted that she still had to process the multiple information screens and physically write the ticket. The court noted that the information Officer Schultz had to review "was not quickly and readily available for her to rush through." The court accredited Officer Schultz's testimony that the K-9 officer arrived on the scene prior to the ticket being completed. The court concluded that "the stop was valid, and was not prolonged nor extended to the point of being unreasonable."

Thereafter, the defendant pled guilty to possession of 300 grams or more of a Schedule I controlled substance with intent to sell or deliver while properly reserving the following certified questions of law pursuant to Tennessee Rule of Criminal Procedure 37(b)(2)(A) that are dispositive of this case:

I.      Whether the traffic stop of [the defendant] was supported by reasonable suspicion to effectuate the traffic stop as required by the Fourth Amendment of the United States Constitution and Article 1 § 7 of the Tennessee Constitution.

II.     Whether the scope of the detention following the traffic stop was exceeded by Officer Schultz, without reasonable suspicion or probable cause, in violation of the [d]efendant's rights under the Fourth Amendment of the United States Constitution and Article 1 § 7 of the Tennessee Constitution.

III.    Whether the evidence obtained as a result of the warrantless search and seizure of [the defendant] should have been suppressed when the State failed to carry its burden in demonstrating that the warrantless seizure and detention of [the defendant] was reasonable.

**ANALYSIS**

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). Both proof presented at the suppression hearing and proof presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998); State v. Perry, 13 S.W.3d 724, 737 (Tenn. Crim. App. 1999).

**I. Initial Traffic Stop**

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals against unreasonable searches and seizures. See U.S. Const. amend. IV; Tenn. Const. art. I, § 7. "These constitutional provisions are designed to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" Keith, 978 S.W.2d at 865 (quoting Camara v. Municipal Court, 387 U.S. 523, 528, 87 S. Ct. 1727, 1730 (1967)). A search or seizure conducted without a warrant is presumed unreasonable, and evidence obtained as a result will be suppressed "unless the prosecution demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement." Id. (citations omitted).

One of those exceptions is when an officer makes an investigatory stop based on reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed. Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968); State v. Binette, 33 S.W.3d 215, 219 (Tenn. 2000). Reasonable suspicion is an objective standard and must be determined from the totality of the circumstances. United States v. Cortez, 449 U.S. 411, 417-18, 101 S. Ct. 690, 695 (1981); see Ornelas v. United States, 517 U.S. 690, 696, 116 S. Ct. 1657,

1661-62 (1996). If an officer observes a violation of a traffic law, the officer has an objective basis for stopping the vehicle. See, e.g., State v. Vineyard, 958 S.W.2d 730, 734 (Tenn. 1997); State v. Levitt, 73 S.W.3d 159, 173 (Tenn. Crim. App. 2001).

Our supreme court noted in State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000), that not all police-citizen encounters involve "seizures" of persons. A "seizure" occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen[.]" Id. (quoting Terry, 392 U.S. at 19 n.16). The Daniel court explained that in determining "'whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether police conduct would have communicated to a reasonable person that the person was not free to decline the officer's request or otherwise terminate the encounter.'" 12 S.W.3d at 425 (quoting Florida v. Bostick, 501 U.S. 429, 440, 111 S. Ct. 2382, 2389 (1991)).

In making this determination,

> [s]ome of the factors which are relevant and should be considered by courts when applying this totality of the circumstances test include the time, place and purpose of the encounter; the words used by the officer; the officer's tone of voice and general demeanor; the officer's statements to others who were present during the encounter; the threatening presence of several officers; the display of a weapon by an officer; and the physical touching of the person of the citizen.

Id. at 425-26.

The Daniel court noted that courts have typically held that an encounter constitutes a "seizure" when an officer: (1) pursues an individual who has attempted to terminate the contact by departing; (2) continues to interrogate a person who has clearly expressed a desire not to cooperate; (3) renews interrogation of a person who has earlier responded fully to police inquiries; (4) verbally orders a citizen to stop and answer questions; (5) retains a citizen's identification or other property; (6) physically restrains a citizen or blocks the citizen's path; or (7) displays a weapon during the encounter. Id. at 426. Moreover, a defendant is clearly seized when a police officer activates the blue lights on his or her patrol car and initiates a traffic stop. Binette, 33 S.W.3d at 218; State v. Pulley, 863 S.W.2d 29, 30 (Tenn. 1993).

The defendant presents the argument that he was seized once Officer Schultz began following him, rather than when she activated her blue lights. As support for this assertion, he points to, among other things, Officer Schultz's observing him at the apartment complex, intentionally following him on Dickerson Pike, speeding to catch up to him, and failing to activate her blue lights while speeding to catch up to him in violation of "a police mandate or policy that requires officers

-6-

to activate their blue lights when exceeding the speed limit."[1] He asserts that he reasonably perceived that these actions by Officer Schultz were an order for him to stop and that his "traffic infraction" was his "attempt to pull over at a safe place."

We are unpersuaded by the defendant's argument. We simply fail to see how the defendant could have reasonably believed that he was not free to continue his course of travel when Officer Schultz abruptly pulled in behind him without her patrol lights activated. Contrary to the defendant's assertion, there is no indication that the defendant was even aware that the officer who pulled in behind him was the same officer who had been at the apartment complex earlier. The defendant also makes the broad statement that Officer Schultz left her "previous police activity" to follow him, yet Officer Schultz testified that she did not follow the defendant out of the apartment complex but actually left before he did. Officer Schultz acknowledged that she sped up to read the defendant's license plate when she caught sight of him on Dickerson Pike. However, an officer's following a car to check its license plate does not raise constitutional concerns. See State v. David M. Whitman, Jr., No. M2004-03063-CCA-R3-CD, 2005 WL 3299817, at *3 (Tenn. Crim. App. Dec. 5, 2005), perm. to appeal denied (Tenn. May 1, 2006). Moreover, one main circumstance the defendant relied on as a show of authority was Officer Schultz's speeding to catch up to him, but interestingly he never testified at the suppression hearing that he was aware of her speeding. The totality of the circumstances fails to prove that the defendant was seized anytime prior to the activation of Officer Schultz's patrol lights.

The defendant's argument that he would have faced charges of evading or fleeing from a police officer had he continued about his course is equally unviable. Officer Schultz testified that she caught up to the defendant to run his license plate and that, until he ran the red light, she had no legal reason to pull him over. The trial court accredited Officer Schultz's testimony that the defendant's running a red light was the factual basis for the stop. We conclude from the totality of the circumstances that no reasonable person would have believed that he had a legal obligation to stop and was thus "seized," prior to the officer's activating her blue lights or exhibiting some other show of authority.

Regardless of whether Officer Schultz had some pretextual motivation for following the defendant, she had a valid legal reason for initiating a traffic stop of the defendant when she witnessed him run a red light. There is no constitutional violation if there is a valid reason for a traffic stop even if the officer may have other motives as a pretext for the stop. Whren v. United States, 517 U.S. 806, 810, 116 S. Ct. 1769, 1772 (1996). Furthermore, the defendant's assertion that he did not run the red light but instead was attempting to yield to Officer Schultz's order to stop was discredited by the trial court. At the suppression hearing, the defendant maintained that he did not run the red light but stopped on the corner because Officer Schultz's blue lights were on. However, as noted above, the trial court accredited Officer Schultz's testimony that she stopped the defendant because he ran a red light.

---

[1] Officer Schultz explained at the suppression hearing that the policy applies when the officer is responding to an emergency call and she was not responding to an emergency call.

## II. Detention

In conducting an investigative stop, the officer's actions must be "reasonably related in scope to the circumstances which justified the interference in the first place," Terry, 392 U.S. at 20, and the detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325 (1983). A traffic stop may be deemed "unreasonable" if the "'time, manner or scope of the investigation exceeds the proper parameters.'" State v. Troxell, 78 S.W.3d 866, 871 (Tenn. 2002) (quoting United States v. Childs, 256 F.3d 559, 564 (7th Cir. 2001), and citing State v. Morelock, 851 S.W.2d 838, 840 (Tenn. Crim. App. 1992)). The relevant inquiry is whether an officer's actions were reasonably related to the traffic stop. Terry, 392 U.S. at 20; State v. Simpson, 968 S.W.2d 776, 783 (Tenn. 1998). Reasonableness turns on the facts and circumstances of each case. United States v. Mendenhall, 446 U.S. 544, 561, 100 S. Ct. 1870, 1881 (1980). The United States Supreme Court has held that a dog sniff performed on the exterior of a defendant's car "while he was lawfully seized for a traffic violation" did not "rise to the level of a constitutionally cognizable infringement." Illinois v. Caballes, 543 U.S. 405, 409, 125 S. Ct. 834, 838 (2005). However, an otherwise lawful canine sweep that is ancillary to a legitimate traffic stop may constitute an unlawful search if the suspect is detained beyond the time necessary to complete the traffic stop. See United States v. Place, 462 U.S. 696, 709, 103 S. Ct. 2637, 2645-46 (1983); Troxell, 78 S.W.3d at 871.

The defendant argues that the lawful parameters of the traffic stop were exceeded in this case. He argues that running a red light "falls within the purview of Tennessee's 'cite and release' statute" and that Officer Schultz ran computer checks outside what was necessary for a traffic stop. He asserts that these additional checks were in violation of the "cite and release" statute and outside constitutional parameters.

Officer Schultz's computer records entered as an exhibit at the hearing show that she ran a local warrant check at 2:31 a.m., an arrest record query at 2:31, a driver's license check at 2:31, two kinds of NCIC warrant checks at 2:31, and a criminal history query at 2:33. At the suppression hearing, there was some indication that the query at 2:33 was a juvenile records check; however, the computer records indicate that the juvenile records check was conducted at 4:01 a.m. by Brian Brown. In his reply brief, the defendant asserts that if the 2:33 check was not a juvenile records check, it was an unnecessary duplicitous criminal history check.

Tennessee Code Annotated sections 40-7-118 and 55-10-207 provide that when an officer observes the commission of certain misdemeanors, the officer is required to cite and release the offender in lieu of effecting a custodial arrest. Tenn. Code Ann. §§ 40-7-118(b)(1); 55-10-207 (2006). We note that while the cite and release statute dictates the situations under which an offender must be cited instead of arrested, by its terms, it does not dictate or limit the scope of an officer's investigation.

In the context of determining whether investigative methods run afoul of the Fourth Amendment and article 1, section 7, this court has stated that "requests for driver's licenses and

vehicle registration documents, inquiries concerning travel plans and vehicle ownership, computer checks, and the issuance of citations are investigative methods or activities consistent with the lawful scope of any traffic stop." State v. Gonzalo Moran Garcia, No. M2000-01760-CCA-R3-CD, 2002 WL 242358, at *21 (Tenn. Crim. App. Feb. 20, 2002) (citing United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000); United States v. Hill, 195 F.3d 258, 268 (6th Cir. 1999); United States v. Lyton, 161 F.3d 1168, 1170 (8th Cir. 1998)), overruled on other grounds by State v. Garcia, 123 S.W.3d 335 (Tenn. 2003). Our research has revealed situations in Tennessee where an officer verbally inquired into an offender's criminal history during the course of a traffic stop. See, e.g., State v. Robert Lee Hammonds, No. M2005-01352-CCA-R3CD, 2006 WL 3431923, at *9 (Tenn. Crim. App. Nov. 29, 2006); State v. Orson Wendell Hudson, No. M2004-00077-CCA-R3CD, 2005 WL 639129, at *4 (Tenn. Crim. App. Mar. 15, 2005). Other jurisdictions also allow the inquiry into an offender's criminal history during the course of a traffic stop. See, e.g., United States v. Olivera-Mendez, 484 F.3d 505, 509 (8th Cir. 2007) ("When police stop a motorist for a traffic violation, an officer may detain the occupants of the vehicle while the officer 'completes a number of routine but somewhat time-consuming tasks related to the traffic violation.' These may include a check of driver's license, vehicle registration, and criminal history . . . .") (internal citation omitted); United States v. Holt, 264 F.3d 1215, 1221-22 (10th Cir. 2001) (en banc) ("[T]he motorist may be detained for a short period while the officer runs a background check to see if there are any outstanding warrants or criminal history . . . . The justification for detaining a motorist to obtain a criminal history check is, in part, officer safety."); United States v. Purcell, 236 F.3d 1274, 1278 (11th Cir. 2001) ("The request for criminal histories as part of a routine computer check is justified for officer safety."); Laime v. State, 60 S.W.3d 464, 474-75 (Ark. 2001); State v. Williams, 590 S.E.2d 151, 154 (Ga. Ct. App. 2003).

In our view, it was not unreasonable for Officer Schultz to make an inquiry into the defendant's criminal history as a part of her computer checks because her doing so did not unreasonably prolong the defendant's detention, and the information could have been pertinent to her continued safety. Along the same lines, the search at 2:33 a.m., whether a juvenile history or other criminal history inquiry, did not unreasonably expand the scope of the stop.

The defendant argues that Officer Schultz detained him longer than necessary to issue a traffic citation. It appears that Officer Schultz stopped the defendant at 2:27 a.m. and started running the computer checks at 2:31. The K-9 unit received the call to report at 2:31. Officer Schultz testified that she was still working on her citation duties when the K-9 unit arrived at 2:43, and the trial court accredited this testimony. The K-9 sniff occurred at 2:48. Although Officer Schultz received the results of the computer checks instantaneously, as determined by the trial court, "she had to process the information from her computer involving the multiple informational screens and physically write the ticket. The fact that the ticket was begun at 2:33 am does not reflect the time it was completed." Vaughn testified at the suppression hearing that it was not likely the various reports would be viewed on the same screen and the officer would have to scroll through the multiple screens. The evidence shows that the defendant had a multi-page criminal history; therefore, it is reasonable to conclude that it took Officer Schultz time to analyze and process it. We cannot

conclude that the defendant has proven that the evidence preponderates against the trial court's findings.

The defendant argues that Officer Schultz abandoned any activity related to the citation once the K-9 unit arrived. On this point, we note that neither Officer Schultz nor Officer Sydenstricker nor the defendant ever testified that Officer Schultz stopped what she was doing when the K-9 unit arrived. The testimony was that Officer Schultz told Officer Sydenstricker why she had pulled the defendant over, asked him to "run the dog around the car," and asked the defendant to exit the car.[2] However, it is an overreaching assumption from that testimony to say that she abandoned the citation process. It is apparent that she stopped the citation process once the dog alerted on the car, but she had probable cause to search the defendant's car once that occurred. See State v. England, 19 S.W.3d 762, 769 (Tenn. 2000) (concluding that a positive reaction to a vehicle by a trained drug detection dog provides probable cause to search the inside of the vehicle).

We acknowledge that traffic stops similar in length to the one at hand have been found to be unreasonable in time, manner, or scope, see, e.g., United States v. Blair, 524 F.3d 740 (6th Cir. 2008); State v. Justin Paul Bruce, No. E2004-02325-CCA-R3-CD, 2005 WL 2007215, at **4-5 (Tenn. Crim. App. Aug. 22, 2005); however, it is a fact-intensive inquiry and "'[n]o hard-and-fast time limit exists beyond which a [traffic stop] detention is automatically considered too long and, thereby unreasonable.'" State v. Eric Berrios, No. W2005-01179-CCA-R9-CD, 2006 WL 525959, at *13 (Tenn. Crim. App. Mar. 3, 2006) (quoting Justin Paul Bruce, 2005 WL 2007215, at *6), aff'd, 235 S.W.3d 99 (Tenn. 2007). Moreover, in Justin Paul Bruce, 2005 WL 2007215, heavily relied on by the defendant, the determination favoring the defendant was made in the trial court; whereas, the trial court here ruled that the stop "was not prolonged nor extended to the point of being unreasonable." Therefore, the defendant had the burden of proving that the evidence preponderates against the trial court's findings – a burden he has not carried.

### III. State's Burden of Proving Reasonableness

The defendant's final assertion is that because Officer Schultz admitted that no reasonable suspicion arose during the traffic stop, the State had to prove that Officer Schultz's actions during the traffic stop and the time of the defendant's detention were no longer than necessary to effectuate the stop. However, this question is essentially a reworking of the defendant's first two questions. It is true that the State had to prove at the suppression hearing that its actions were in conformity with an exception to the warrant requirement. The trial court found that the stop was valid and not prolonged or extended to the point of being unreasonable. On appeal, it was the defendant's burden to prove that the evidence preponderates against the trial court's findings. As we have determined above, the defendant has not met this burden.

---

[2] The record indicates that the dog was cross-trained in apprehension and Officer Schultz wanted to prevent any accidents with the dog during the sniff.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the trial court's denial of the defendant's motion to suppress.

_____
ALAN E. GLENN, JUDGE